

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

## No. 06-15-00160-CR

_____

JOSHUA MADISON NEWKIRK, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 354th District Court
Hunt County, Texas
Trial Court No. 29984

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Burgess

O P I N I O N

On February 14, 2014, Stacie Clayton received angry and threatening text messages from her ex-husband, Joshua Madison Newkirk. The text messages led to a telephone conversation between Newkirk, Clayton, and Clayton's fiancé, Joshua Edmund Gerber. The conversation ended when Gerber, a martial-arts expert, told Newkirk he would meet him at Newkirk's house. Newkirk, who was not at home, travelled to that location recklessly and at a high rate of speed. Shortly after he arrived, neighbors heard several gunshots and discovered Gerber's lifeless body. Newkirk admitted shooting Gerber, but claimed he acted in self-defense. Newkirk was charged with murder, and at his trial, the jury rejected his defense, convicted him, and then sentenced him to forty years' imprisonment.

On appeal, Newkirk argues that the trial court erred in failing to include an instruction on sudden passion during the punishment phase of his trial. He also argues that counsel's failure to request such an instruction constituted ineffective assistance. We conclude that the trial court was under no duty to sua sponte instruct the jury on an unrequested sudden-passion issue. We further find that Newkirk cannot demonstrate prejudice in the omission of a sudden-passion instruction. Accordingly, we affirm the trial court's judgment.

I.    There Was No Duty to Instruct the Jury on an Unrequested Defensive Issue

A.    Standard of Review

"At the punishment stage of a trial, the defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.02(d) (West 2011). "If the defendant proves the issue in the

2

affirmative by a preponderance of the evidence, the offense is a felony of the second degree." *Id.* "'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE ANN. § 19.02(a)(2) (West 2011). "'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." TEX. PENAL CODE ANN. § 19.02(a)(1) (West 2011).

"[T]he jury is . . . bound to receive the law from the court and be governed thereby." TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007). "A trial court must submit a charge setting forth the 'law applicable to the case.'" *Lee v. State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007)). We employ a two-step process in our review of alleged jury charge error. *See Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32).

## B. Application

The question here is whether sudden passion was the law applicable to the case. In *Posey v. State*, the Texas Court of Criminal Appeals determined that defensive issues "are not 'law applicable to the case' under Code of Criminal Procedure 36.14 unless and until the defendant raises the issue by a timely objection or request." *Wooten v. State*, 400 S.W.3d 601, 605 n.19 (Tex. Crim. App. 2013) (quoting *Posey v. State*, 966 S.W.2d 57, 60–62 (Tex. Crim. App. 1998)). Thus,

3

*Posey* held that "the trial judge has no duty to instruct the jury *sua sponte* regarding" defensive issues. *Id.* (citing *Posey*, 966 S.W.2d at 62) (reasoning that Texas Code of Criminal Procedure Article 36.14's requirement to raise objections to the charge would be rendered meaningless if the court ruled otherwise).[1] Yet, the defensive issue in *Posey* was "mistake of fact," and the Texas Court of Criminal Appeals has "yet to specifically address whether sudden passion is a defensive issue in contemplation of *Posey*." *Id.*

Likewise, this Court has not previously determined whether an instruction on sudden passion is required sua sponte if raised by the evidence.[2] However, several of our sister courts have previously determined that sudden passion is a defensive issue and, therefore, does not become the law of the case until it is raised by the defendant. *Russell v. State*, No. 03-12-00440-CR, 2014 WL 1572473, at *4 (Tex. App.—Austin Apr. 18, 2014, pet. ref'd) (mem. op., not designated for publication); *Wilson v. State*, No. 08-11-00042-CR, 2013 WL 461060, at *8 (Tex. App.—El Paso Feb. 6, 2013, pet. ref'd) (not designated for publication) (citing *Swaim v. State*, 306 S.W.3d 323, 325 (Tex. App.—Fort Worth 2009, pet. ref'd)); *see also Eisert v. State*, No. 05-05-01604-CR, 2006 WL 3259339, at *2 (Tex. App.—Dallas Nov. 13, 2006, no pet.) (mem. op., not designated for publication); *Romero v. State*, No. 01-03-00558-CR, 2004 WL 2677124, at *7 (Tex.

---

[1]In *Almanza v. State*, the Texas Supreme Court "set out the 'basic framework for analysis' on appeal to preserved and unpreserved 'errors' in the jury charge." *Posey v. State*, 966 S.W.2d 57, 60 (Tex. Crim. App. 1998) (quoting *Almanza v. State*, 686 S.W.2d 157, 171–174 (Tex. Crim. App. 1984)). The *Almanza* harm analysis does not apply unless there is error in the jury charge. *Id.*

[2]We note that a prior opinion issued by this Court applied the *Almanza* harm analysis to the trial court's omission of a sudden-passion instruction in the jury charge. *Grider v. State*, 139 S.W.3d 37, 38 n.1 (Tex. App.—Texarkana 2004, no pet.). However, that case was originally appealed to the Fifth Court of Appeals in Dallas and was transferred to us by the Texas Supreme Court pursuant to its docket equalization efforts. Accordingly, in deciding *Grider*, we followed the precedent of the Dallas Court of Appeals as it existed at that time. *See* TEX. R. APP. P. 41.3.

App.—Houston [1st Dist.] Nov. 24, 2004, pet. ref'd) (mem. op., not designated for publication); *Haynes v. State*, No. 14-99-00533-CR, 2001 WL 306434, at \*4 (Tex. App.—Houston [14th Dist.] Mar. 29, 2001, pet. ref'd) (not designated for publication); *Rios v. State*, 990 S.W.2d 382, 384 (Tex. App.—Amarillo 1999, no pet.); *Leach v. State*, 983 S.W.2d 45, 49 (Tex. App.—Tyler 1998, no pet.).[3]

After examining the reasoning in *Posey* and the opinions penned by our sister courts, we conclude that sudden passion is a defensive issue which must be requested by the defendant in order to become "the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). Accordingly, because Newkirk failed to request a sudden-passion instruction, the trial court had no duty to sua sponte include it in the punishment charge. We overrule Newkirk's first point of error.

## II. Newkirk Cannot Show Prejudice from Counsel's Failure to Request the Sudden-Passion Instruction

In his second point of error, Newkirk argues that his counsel rendered ineffective assistance in failing to object to the omission of a sudden-passion instruction in the punishment charge. In order to succeed on this point, Newkirk must demonstrate that he was entitled to the instruction, that there was no possible trial strategy that could have contributed to counsel's decision not to seek a sudden-passion instruction, and that he was prejudiced by the omission of the sudden-passion instruction. Because we find that Newkirk cannot demonstrate prejudice, we overrule his second point of error.

---

[3]Although unpublished cases have no precedential value, we may take guidance from them "as an aid in developing reasoning that may be employed." *Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.—Amarillo 2003, pet. ref'd).

## A.     Standard of Review

The right to counsel does not mean the right to errorless counsel. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).  In order to prevail on a claim of ineffective assistance of counsel, the defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). *See Ex parte Imoudu*, 284 S.W.3d 866, 869 (Tex. Crim. App. 2009). The first prong requires a showing that counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688.  That requirement can be difficult to meet since there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

The second *Strickland* prong, sometimes referred to as "the prejudice prong," requires a showing that, but for counsel's unprofessional error, there is a reasonable probability that the result of the proceeding would have been different. *Id.* at 694.  "A reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome." *Id*.

Failure to make a showing under either prong defeats a claim for ineffective assistance. *Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003).  The *Strickland* test, "of necessity[,] requires a case-by-case examination of the evidence." *Williams v. Taylor*, 529 U.S. 362, 382 (2000) (quoting *Wright v. West*, 505 U.S. 277, 308 (1992) (Kennedy, J., concurring in judgment)).[4]

---

[4]Allegations of ineffectiveness "must 'be firmly founded in the record.'" *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002) (quoting *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999)).  The Texas Court of Criminal Appeals has said that "[t]rial counsel 'should ordinarily be afforded an opportunity to explain his actions' before being denounced as ineffective." *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012) (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)).  When a claim of ineffective assistance of counsel is raised for the first time on direct appeal, the record "is in almost all cases inadequate to show that counsel's conduct

6

**B.      Sudden Passion**

In determining whether sudden passion was an issue in the punishment phase of a trial, appellate courts review the record to see if there was some evidence that:  (1) the defendant acted under the immediate influence of terror, anger, rage, or resentment; (2) the defendant's sudden passion was induced by some provocation by the victim and such provocation would commonly produce such passion in a person of ordinary temper; (3) the defendant committed the murder before regaining his capacity for cool reflection; and (4) there was a causal connection between the victim's provocation, the defendant's passion, and the homicide.  *Beltran v. State*, 472 S.W.3d 283, 294 (Tex. Crim. App. 2015). "A defendant's testimony alone is sufficient to raise a defensive issue requiring an instruction in the charge." *Id.* at 290.

A defendant that presents evidence of sudden passion is entitled to an instruction on this mitigating circumstance "even if that evidence is weak, impeached, contradicted, or unbelievable." *Trevino v. State*, 100 S.W.3d 232, 238 (Tex. Crim. App. 2003) (per curiam).  The question is "whether there was any evidence from which a rational jury could infer sudden passion." *Moore v. State*, 969 S.W.2d 4, 11 (Tex. Crim. App. 1998).  "Anything more than a scintilla of evidence is sufficient to entitle a defendant" to a sudden passion instruction at punishment. *Jones v. State*, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998) (quoting *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994)).

---

fell below an objectively reasonable standard of performance." *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005).  Where, as here, the record is silent as to why trial counsel failed to take certain actions, the defendant must show that, under prevailing professional norms, no competent attorney would fail to do what trial counsel failed to do. *Id*.  Here, we need not decide whether Newkirk made this showing because we find that Newkirk has failed to demonstrate prejudice by his counsel's inaction.

### C. The Evidence

#### 1. Newkirk Becomes Angry with His Ex-Girlfriend, Clayton

The 2014 Valentine's Day murder of Gerber was the culmination of a disagreement between Newkirk and Clayton, who were previously in a romantic relationship that lasted for two years and bore them a daughter. Newkirk, who had regular visitation with his daughter, was under a court order to pay child support to Clayton. According to Clayton, Newkirk was "always civil," knew that she and Gerber were dating, and was never rude to either her or Gerber.

Clayton testified that, on Valentine's Day morning, Newkirk texted her to express his wish that they rekindle their relationship. Clayton denied Newkirk's invitation by informing him that she was engaged and already considered herself married to Gerber. At 1:20 p.m., Newkirk texted Clayton the following: "I'm mad as hell, mad enough to beat your mother fucking ass like a piece of shit man." Clayton testified that she was stunned by the message because Newkirk had never spoken to her like that before.

When Clayton texted Newkirk to ask why he was mad at her, Newkirk called at 1:25 p.m. to threaten her. According to Clayton, Newkirk demanded that she pay for proceedings that would allow him to relinquish his parental rights to their daughter and threatened "to come to [her] house and beat [her] like a man" if she did not acquiesce. Clayton testified, "He was very very angry and had a lot of hatred in his voice." Worried, Clayton hung up the telephone and reported the conversation to her father, Vernon Melton, who expressed concern for her safety.

8

### 2.  Clayton's Father and Fiancé Get Involved

Melton called Newkirk, and the two spoke at 1:45 p.m.  Melton informed Newkirk that he had a problem with the way Newkirk spoke to Clayton and that he was going to drive to Newkirk's father's house in hopes that he would straighten Newkirk out.  According to Melton, Newkirk responded that he would be waiting for him with a double-barrel shotgun.  Newkirk explained his reaction, stating, "[Melton] said I'm going to go over to your dad's house and talk to him about that and I said by God that's my ex-wife and that's my daughter.  I don't need my dad stepping in to stick up for me, Goddamit.  I'll meet you there."  Newkirk left work and began driving home.[5]

Meanwhile, Clayton had called Gerber, who became upset at Newkirk after discovering his threats toward Clayton.  Gerber drove to meet Clayton, who was waiting to have her car washed at a local carwash.  Gerber sat with Clayton in her car and heard the conversation she had with Newkirk over the car speakerphone when he called her at 1:59 p.m.  According to Clayton, Newkirk, still angry, asked her about her father's whereabouts, and started rambling, cursing, and calling her names.  Gerber announced to Newkirk that he was listening to the conversation and told Newkirk that he was coming to his house.  Gerber left, leaving Clayton at the carwash.

Heath Wise testified that, at approximately 2:00 p.m., he saw Newkirk "driving erratic, going into the oncoming traffic, running people off the road, just driving all over the road."  Wise, who was driving in the same lane of travel, passed Newkirk's truck to avoid him, but Newkirk sped up and almost touched the bumper on Wise's car.  Wise testified that he stopped in the middle of the road, threw his car in park, jumped out, and confronted Newkirk.  Wise recognized Newkirk,

---

[5]Newkirk lived with his parents.

saw that he was not in a good mood, and got back into his car. According to Wise, "[Newkirk] punched it, came straight for us, and then took a hard right through a yard, couple of yards." Wise testified that Newkirk "had death in his eyes."

### 3. Newkirk Kills Gerber

Melton testified that Newkirk called him at 2:04 p.m. to see where he was. According to Melton, when he said he was on his way, Newkirk said, "[W]ell, Gerber is coming over here and I'm going to kill him." Several of Newkirk's neighbors heard the gunshots that killed Gerber.

Carl Reimold, who lived across the street from Newkirk, testified that he saw Newkirk speeding in the neighborhood at around 2:00 p.m. A few minutes later, Reimold heard gunshots. He peeped through his window and witnessed Newkirk pacing in his driveway with a shotgun in his hand while Gerber lay face down in the middle of the street. Erica Vance, who also lived across the street from Newkirk, testified that she was sitting outside on her porch when she heard the gunshots. Vance testified that she heard no shouting or commotion before the gunshots. Lola Thornton, who lived nearby, was in her front yard sweeping the sidewalk when she heard three gunshots. Thornton testified, "I looked up in the direction [the noise] was coming from . . . there was a car parked in front of [Newkirk's] house, and there was a man standing beside of it with the front door open like he was fixing to get in the car. And then just very shortly[,] he fell back into the street." Reimold and Vance called the police.

### 4. Evidence of Self-Defense

Ron Olson, another neighbor, was driving home when he saw Gerber in the street. He stopped and asked Newkirk what happened. According to Olson, Newkirk said Gerber was

10

"knocking on his door, pounding on his door, and when he opened the door [Gerber] started punching him." Olson said that Newkirk admitted to shooting Gerber. Olson noted that Newkirk and Gerber were similar in size and said Newkirk looked "scruffy" and had red marks on his chest, side, and face "like somebody hit him with their fist or something." Melton arrived next, and Newkirk also told him that Gerber had kicked him. Melton testified that Gerber showed him a mark on his left side.[6]

Newkirk provided his version of the events during a custodial interview. According to Newkirk, both Melton and Gerber threatened to beat him after they arrived at his home. Newkirk testified that Gerber knocked on his front door, that he did not recognize him, but that he exited the garage door and decided to greet him. Newkirk claimed that Gerber immediately started hitting him on his head, chest, and side. Newkirk then kicked him "way back," told Gerber to back off, and said, "You need to talk to me about this." Newkirk claimed that Gerber charged him and tackled him to the ground in the garage. Newkirk, who claimed to always carry a gun, said he shot Gerber while he was on top of him in the garage because he knew Gerber "was fixing to get [him]." According to Newkirk, Gerber ran back to the car while yelling, "I'm going to show you what it's like to be shot with a gun." Newkirk claimed that he shot Gerber again because he saw him digging in his car for a gun.

Lynn Booth, a sergeant with the Caddo Mills Police Department, testified that the red mark on Newkirk's side could have been from a kick or punch. According to Booth, Newkirk said that

---

[6]By the time Clayton arrived on the scene, Gerber was surrounded by emergency responders.

Gerber had hit him, that he was able to push Gerber away initially, but that he shot Gerber when he charged him.

### 5. Evidence Negating Self Defense

Although Booth noticed the red mark on Newkirk's side, he saw no bruising or swelling on Newkirk's face and saw no evidence of repeated blows. Booth also saw no signs of a scuffle in the garage. Newkirk claimed that Gerber was shot in the garage. Although there were two shell casings in the garage, no blood was present. Booth found other shell casings and droplets of blood in the driveway. After examining the evidence, Booth concluded that Gerber was "running back towards the street" as Newkirk was advancing with a weapon. Lieutenant Roger Seals came to the same conclusion and testified that "[t]he shell casings looked like the person who fired the gun was probably out on the driveway," not in the garage. He also noted that the space in the garage was "tight" and that "if it was two grown men in there fighting, things would have been knocked over."

Booth arrested Newkirk. While in the back of Booth's patrol car, Newkirk made several statements to himself, including: "and the devil entered the door"; "I know that first bullet hole got his ass"; "I told you not to fuck with me"; "he ain't gotta worry about that motherfucker. I didn't tell him I was gonna shoot him. I told him I was gonna whoop his fucking ass." No weapon was found in Gerber's car. Newkirk was transported to jail after his father located the murder weapon in his room and handed it to Booth.

During a jailhouse telephone call, an unidentified friend of Newkirk said that someone heard Newkirk "probably got beat up." When asked, "Did that dude beat your ass," Newkirk

laughed and indicated that he was not beat up. After a brief pause, he then said, "We was just fighting."

Bryan Barrett, the Caddo Mills Police Department Chief of Police, also testified that Newkirk had no facial injury or bruising and that the red mark on his side was "just like a red line, more like a scratch you would see." According to Barrett, Newkirk had several versions of the encounter, which did not seem to "fit with the evidence on scene." Barrett testified that he saw no signs of any struggle in the garage where Newkirk claimed he was wrestled to the ground by Gerber.

Stephanie Burton, a Dallas County Medical Examiner, testified that Gerber had sustained six gunshot wounds, three that entered from the front side of his body and three from the back. Kevin Callahan, a forensic scientist with the Texas Department of Public Safety Crime Laboratory in Garland, Texas, tested the shirt Gerber was wearing for stippling. According to Callahan, the lack of stippling on Gerber's shirt indicated that there were no "contact shots."[7]

After hearing this evidence, the jury rejected Newkirk's theory of self defense and found him guilty, beyond a reasonable doubt, of murder.

### 6.     Punishment Evidence

During the punishment phase of Newkirk's trial, the State did not present evidence that Newkirk had previously committed any crime, and several witnesses testified in his favor. Newkirk's wife, Lauren Kay Newkirk, testified that she had a son with Newkirk and that he was

---

[7]However, Krista Michael, trace evidence examiner at the Southwestern Institute of Forensic Sciences in Dallas, Texas, found gunshot residue on the back of Gerber's right hand, which indicated that Gerber was either firing a firearm, handling a firearm, or in the proximity of a firearm when it was fired.

an "awesome dad" to his children and a wonderful husband to her. Yet, she also indicated that they were not together on Valentine's Day 2014 because they "argued a lot."

Jacqueline Newkirk, Newkirk's mother and an assistant principal at an elementary school, testified that her son is a kind and compassionate person that cares for his children. She testified that she had never known Newkirk to be violent.[8] Newkirk's best friend, Chris O'Grady, described him as a good and helpful person.

However, the jury heard about acts committed by Newkirk while he was free on bond, which they weighed in assessing his punishment. Lisa McBride testified that, while driving to a daycare to pick up her children, she became the subject of Newkirk's road rage. To escape, she pulled into the daycare parking lot and headed for the door. Newkirk pulled in behind her, got out of his car, and was stopped by people who advised him to leave McBride alone. According to McBride, "[Newkirk] leaned over one of the guys and asked me what my problem was."

In another incident, Weldon Altom, a seventeen-year-old high school student, almost hit Newkirk's car while driving. Altom testified that he tried to wave at Newkirk so that he could apologize to him, but Newkirk kept driving. After learning Altom's identity, Newkirk went to Altom's high school and asked to speak to school resource officer Kimbre Collier, who also happened to be the police officer that transported Newkirk to jail from Booth's car. Collier testified that Newkirk informed her that he was almost hit by Altom's car and asked to speak with him. Collier suggested that contact with Altom was not a good idea and said that she would speak

---

[8]Newkirk's mother also testified that he was shot in the head with a BB gun when he was thirteen and had to undergo brain surgery. She did not explain whether that injury had any lasting effects on Newkirk.

14

with Altom instead. Newkirk responded that he would wait for Altom in the parking lot after school. Collier testified, "[Newkirk] stated to me that he attempted to chase [Altom] down after the incident and wanted to slash his tires with a chain saw." Yet, Newkirk left the campus after telling Collier that he was going to contact Altom's father, Jay Altom. The school notified Jay about the incident and Newkirk's pending murder charge. Jay testified, "[W]e had an extreme fear that Newkirk would come to our house."

Jerry Weatheread testified that he was eating at a local diner with friends when he saw Newkirk walk in wearing a heavy jacket. Because it was not a cold day, he asked Newkirk why he was wearing the jacket. Weatheread testified that, in response, Newkirk walked up to the table, opened up his jacket, and displayed a pistol that was placed in the inside jacket pocket.

After hearing the punishment evidence, the jury assessed a sentence of forty years' imprisonment.

### D. Newkirk Cannot Demonstrate the Second *Strickland* Prong

"A defendant's testimony alone is sufficient to raise a defensive issue requiring an instruction in the charge." *Beltran*, 472 S.W.3d at 290. Further, "sudden passion and self-defense are not mutually exclusive. A jury's rejection of self-defense at the guilt/innocence phase does not preclude submission of a sudden passion issue at the punishment phase." *Id.* (footnote citation omitted); *see Chavez v. State*, 6 S.W.3d 66, 72 (Tex. App.—San Antonio 1999, pet. ref'd) ("When the defendant raises issues of self-defense during the guilt/innocence phase of trial, the issue of sudden passion is typically also raised.").

However, "[i]f, except in 'a rare instance,' the same evidence raising a fact issue on self-defense also raises an issue on 'sudden passion,' then it must also be true that, except in rare instances, when the State's evidence is sufficient to overcome a claim of self-defense, it will also be sufficient to show the absence of sudden passion." *Chavez*, 6 S.W.3d at 73 (quoting *Benavides v. State*, 992 S.W.2d 511, 525 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd)). Further, "under Texas' discretionary non-capital punishment scheme, in order for an appellant to prevail on an ineffective assistance of counsel argument resulting from professional errors applicable to the sentencing phase where the jury determined the sentence, the record must demonstrate *Strickland* prejudice beyond mere conjecture and speculation." *Lampkin v. State*, 470 S.W.3d 876, 918–19 (Tex. App.—Texarkana 2015, pet. ref'd). Newkirk argues that, if his trial counsel had requested a sudden-passion instruction, the court would have given the instruction and the jury could have considered a different range of punishment. Thus, Newkirk argues, "[T]here is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Yet, merely showing that a sudden-passion instruction would have given the jury another sentencing opinion is not enough to demonstrate prejudice under *Strickland*. Rather, Newkirk must demonstrate a reasonable probability that, but for counsel's failure to request the sudden-passion instruction, he would have received a less harsh sentence. *See Potts v. United States*, 566 F.Supp.2d 525, 537 (N.D. Tex. 2008) ("[I]n the case of ineffective assistance at sentencing, prejudice is established if the movant demonstrates that his sentence was increased by the deficient performance of his attorney. In other words, the movant must show that counsel's deficiencies

16

created a reasonable probability that his sentence would have been less harsh."), citing *Glover v. United States*, 531 U.S. 198, 200 (2001) (holding that, "if an increased prison term did flow from an error[,] the petitioner has established *Strickland* prejudice").[9] This means that Newkirk must establish (1) that he would have received the sudden-passion instruction had counsel requested it and (2) that upon hearing the instruction, the jury would have imposed a lesser sentence. Even assuming that Newkirk was entitled to the sudden-passion defense on this record,[10] we find that Newkirk has not established a reasonable probability that the jury would have imposed a less harsh sentence.

---

[9]In *Spriggs v. Collins*, the United States Court of Appeals for the Fifth Circuit held, "In order to avoid turning *Strickland* into an automatic rule of reversal in the non-capital sentencing context, we believe that in deciding such an ineffectiveness claim, a court must determine whether there is a reasonable probability that but for trial counsel's errors, the defendant's non-capital sentence would have been *significantly* less harsh." *Spriggs v. Collins*, 993 F.2d 85, 88 (5th Cir. 1993) (per curiam), *abrogated on other grounds by Dale v. Quarterman*, 553 F.3d 876, 880, n.2 (5th Cir. 2008) (per curiam). In *Dale v. Quarterman*, the Fifth Circuit noted, "The *Spriggs* 'significantly less harsh' standard applies here because Dale's habeas petition alleges ineffective assistance of counsel during a state sentencing hearing, not a federal one." *Dale v. Quarterman*, 553 F.3d 876, 880, n.2 (5th Cir. 2008) (per curiam) (citing *United States v. Grammas*, 376 F.3d 433, 438 & n.4 (5th Cir. 2004) ("holding that *Glover v. United States*, 531 U.S. 198, 203 (2001), which cites *Spriggs*, abrogates the significantly less harsh test only in the federal sentencing context"). Later cases merely require a showing that the defendant would have received a less harsh sentence. *See Potts*, 566 F.Supp.2d at 537.

It is true that the cases cited above were federal habeas appeals where a more deferential standard of review is applied to state court decisions, namely, whether the "Texas court's adjudication of his claim 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Dale*, 553 F.3d at 879 (quoting 28 U.S.C.A. § 2254(d)(1) (West 2015)). Nevertheless, that does not change the fact that, in order to show prejudice under *Strickland*, it is not enough to simply show that another sentencing option was available; rather, the appellant must demonstrate a reasonable probability that but for counsel's unprofessional conduct, he would have received a less harsh sentence. *Potts*, 566 F.Supp.2d at 537.

[10]"An actor who fears for his life may coolly and deliberately dispatch his assailant without panic or hysteria." *Fry v. State*, 915 S.W.2d 554, 559 (Tex. App.—Houston [14th Dist.] 1995, no pet.). "Evidence of the accused's fear is not enough unless the cause of the accused's fear could produce fear that rises to a level of terror which makes a person of ordinary temper incapable of cool reflection." *Merchant v. State*, 810 S.W.2d 305, 310 (Tex. App.—Dallas 1991, pet. ref'd) (citing *Daniels v. State*, 645 S.W.2d 459, 460 (Tex. Crim. App. 1983)).

The jury heard evidence that (1) Newkirk told Melton he would be waiting for him at his house with a gun, and Gerber was killed twenty minutes after that statement was made; (2) Newkirk told Melton that he was going to kill Gerber, and Gerber was killed immediately after that statement was made; (3) there were no signs of a struggle in the garage; (4) Vance heard no commotion before the gunshots; (5) Newkirk and Gerber were the same size; (6) Newkirk indicated in a jailhouse telephone call that he was not overpowered by Gerber; (7) the only injury to Newkirk was a red mark on his side; (8) Gerber was not carrying a weapon; (9) Gerber was shot three times on the back of his body; and (10) officers concluded from the physical evidence that Newkirk fired while advancing toward Gerber, who was retreating back to his car. Also, the evidence presented at punishment suggested to the jury that Newkirk was easily provoked and acted out of anger more quickly than a person of ordinary temper. Accordingly, the jury had before it sufficient evidence by which it could determine a sentence of forty years' imprisonment was warranted.

Moreover, by rejecting Newkirk's self-defense issue raised during guilt/innocence, the jury indicated that it did not believe Newkirk's claim that he shot Gerber while the two were in the midst of a serious struggle. *See Wooten*, 400 S.W.3d at 609. And, as the Court of Criminal Appeals has noted, "It is highly unlikely that a jury that had already rejected the appellant's claim that he reasonably believed that deadly force was immediately necessary to defend himself would nevertheless find in his favor on the issue of sudden passion." *Id*. Given the jury's previous rejection of self defense and the evidence the jury had before it, Newkirk's suggestion that, if the jury had received a sudden-passion instruction, it could have decided that Gerber provoked

18

Newkirk in a manner that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper sufficient to render him incapable of cool reflection is nothing more than speculation.[11]  Accordingly, Newkirk has failed to establish a reasonable probability that, but for his counsel's failure to request a sudden-passion instruction, he would have received a less harsh sentence and, therefore, has failed to establish prejudice as required by *Strickland*.

## III.    Conclusion

For all of the foregoing reasons, we overrule Newkirk's points of error and affirm the trial court's judgment and sentence.


Ralph K. Burgess
Justice


Date Submitted:        August 4, 2016
Date Decided:          November 9, 2016

Publish

---

[11]*See Bradford v. Whitley*, 953 F.2d 1008 (5th Cir. 1992).  The Fifth Circuit held in *Bradford* that the defendant's claim of ineffective assistance of counsel at sentencing was too speculative to demonstrate *Strickland* prejudice.  In an attempt to establish ineffective assistance, Bradford had argued,

> Had his counsel raised a double jeopardy objection at trial, the state would have probably opted to prosecute him for the "more serious offense" of attempted first-degree murder instead of attempted armed robbery, which in turn would have likely resulted in an attempted manslaughter conviction. Because an attempted manslaughter conviction carries a less serious penalty than attempted armed robbery, "Bradford would be looking at release in a few short months by this time—rather than another 40 years of hard labor."

*Id.* at 1011–12.

19