COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | § | No. 08-15-00350-CR |
|---|---|---|
| MARTHA ACEVEDO, | § | Appeal from the |
| Appellant, | § | 243rd District Court |
| v. | § | of El Paso County, Texas |
| THE STATE OF TEXAS, | § | (TC# 20140D05736) |
| Appellee. | § | |
| | § | |

## O P I N I O N

In this appeal, Appellant Martha Acevedo challenges her murder conviction of Jose Acevedo, her husband for over forty-five years. Appellant claims egregious harm in the trial court's failure to include instructions in the jury charge as to the voluntariness of Appellant's inculpatory statements, egregious harm in the trial court's incorrect jury charge instructions regarding the law of self-defense, and ineffective assistance of counsel in handling the alleged jury charge errors regarding the law of self-defense.

## BACKGROUND

On the morning of September 25, 2014, the El Paso Sherriff's Office ("EPSO") was notified of the unattended death of Jose Acevedo at his home in San Elizario, Texas. The

paramedics who first arrived at the Acevedo residence found Jose's[1] body lying on the living room floor in rigor mortis. He had a ligature mark around his neck from ear to ear, bruising on his nose and cheekbones, and a one-inch laceration with dried blood on his nose. His blood-alcohol content was 0.397 grams per deciliter. The ligature wound on Jose Acevedo's neck was later determined to be the cause of death. Detective Jorge Andrade with the El Paso County Sherriff's Office asked Appellant if she would speak with detectives at the EPSO headquarters. Appellant complied. During a second interview at EPSO headquarters, Appellant confessed to strangulating her husband with an apron by wrapping the apron's top loop around Jose Acevedo's neck. Appellant was indicted for the murder of Jose Acevedo on December 4, 2014. The indictment alleged both that Appellant intentionally and knowingly caused Jose's death by strangling his neck with an apron, and that Appellant committed an act clearly dangerous to human life by strangling Jose with an apron, causing his death.

### Pre-Trial

Appellant filed a pre-trial motion to suppress a confession she made to law enforcement, challenging the voluntariness of her inculpatory confession. After a hearing, the trial court denied Appellant's motion to suppress.

Appellant, testifying through an interpreter at the suppression hearing, explained that on the morning of September 25, 2014, law enforcement officers placed her in a vehicle and had her wait for what she described as a very long time. She did not speak to Detective Andrade at the Acevedo residence and stated that she was not asked any questions while in the vehicle. Appellant admitted she voluntarily accompanied the officers to EPSO headquarters, that she was not placed

---

[1] Given the common surname between Appellant Martha Acevedo, the victim Jose Acevedo, and their son, Ruben Acevedo, we will use first names in this opinion.

2

in handcuffs, and that she was never told that she did not have to accompany the officers or that she was free to leave.

She asked to use the restroom several times. She stated that she was first allowed to use the restroom at the police station and then later again at the sheriff's station. Appellant explained that once at EPSO headquarters, she was "locked up." On her last trip back from the restroom she saw her son Ruben Acevedo but did not speak to him. Appellant stated that the detectives returned her to the interview room and informed her that Ruben was a suspect in Jose's murder and that if she did not confess, they would arrest both Appellant and Ruben.

Appellant also testified that at some point while at EPSO headquarters, she was escorted to the polygraph room with a detective and the two began discussing the polygraph machine.[2] The detective also told Appellant about himself, including that he had been a child in a dysfunctional family and that he understood family abuse. Appellant stated that this detective also told her to confess.

*Detective Andrade*

Detective Andrade testified that he arrived at the Acevedo residence at approximately 7:30 a.m. on September 25, 2014. Appellant informed Detective Andrade that she was the only person in the house with her husband that previous night. He then asked Appellant if she would accompany investigators to EPSO headquarters in order to aid the investigation into her husband's death. At this point, Detective Andrade explained, Appellant was neither under arrest or a suspect. Appellant complied and rode with another detective to EPSO headquarters in the front-seat passenger's seat. Once at EPSO headquarters, Detective Andrade advised Appellant of her

---

[2] This portion of the course of events was never clearly delinated by Appellant.

*Miranda*[3] rights verbally and through an English and Spanish form, which Appellant signed. Detective Andrade testified that he did not tell Appellant that Ruben was a suspect or that he would be arrested. Detective Andrade also testified that Appellant had a lower lip injury.

*First Interview*

This first video recorded interview was conducted in Spanish. Appellant spoke with detectives for approximately one hour and twenty minutes, agreed to provide a DNA sample, did not confess or otherwise make any incriminating statements. Appellant's first interview was in most respects similar to her later accounts except as it pertained to what happened to Jose. Appellant stated that she and Jose ate dinner at a taco restaurant and returned home the evening Jose died. She explained that once home, Jose had a beer and she went to bed. She denied knowing what happened to Jose. Detective Andrade asked Appellant if she would be willing to submit to a polygraph examination, to which she agreed.

*Detective Chavarria*

Detective Gonzalo Chavarria, the EPSO's polygraph examiner, testified that Appellant had been escorted by Detective Andrade and Detective Santibanez to the polygraph examination room. He described the layout of the office, stating that if "somebody was standing in the hallway when [Appellant and the detectives] passed by, they would have to see [whoever was standing in the hallway]." Once transferred to the polygraph examination room, Appellant met with Detective Chavarria. Appellant asked him if her son Ruben would also be subjected to a polygraph examination, to which Detective Chavarria responded that it was possible. Appellant began asking him more questions about the polygraph machine at which point Detective Chavarria advised her

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

*Miranda* warnings verbally and again in a Spanish form, which Appellant signed. After signing the form, Detective Chavarria stated that he noticed Appellant became emotional and stated that she did not want her family to undergo a polygraph examination or through the investigation. Appellant subsequently confessed that she had killed her husband with an apron. Detective Chavarria informed Detectives Andrade and Santibanez that Appellant had confessed. After being informed that Appellant had confessed, Detective Andrade escorted Appellant back to the interview room for a second interview after administering another set of *Miranda* warnings verbally and through an English and Spanish form, which Appellant again signed.

### Second Interview

In this second interview, also conducted in Spanish, Appellant confessed that she strangulated her husband using the top loop of a blue apron she made and had left hanging on the washer's door at her home. Appellant explained that she and Jose never went to a taco restaurant but instead went to buy alcohol that evening. Once home, she drank some of the vodka they had purchased. When she awoke later that evening, she noticed the vodka bottle was empty and that Jose was intoxicated. After attempting to talk to him, she retrieved the apron and proceeded to strangle him. She subsequently locked herself in her room and fell asleep.

### Ruben Acevedo

Ruben testified that Appellant called to alert him about his father while he was working in Carlsbad, New Mexico. After arriving at the scene at the Acevedo residence, an officer informed him that he would need to provide a statement, to which Ruben agreed. After providing a statement at a substation, the detectives transported Ruben to EPSO headquarters. There, he saw Appellant walk past him as she walked from one room to another. Ruben explained that he had no doubt she had seen him as well. Ruben was not handcuffed and was not informed that he was a suspect or

5

that he was under arrest.

The State stipulated that detectives at EPSO headquarters walked Appellant past her son Ruben at the end of the suppression hearing. The trial court denied Appellant's motion to suppress and entered Findings of Fact and Conclusions of Law. The case proceeded to trial.

**Trial**

The trial began on October 26, 2015. Through a motion-in-limine, Appellant and the State agreed to limit any discussion concerning the attempted polygraph examination that occurred at EPSO headquarters. The parties agreed to "talk around" the circumstances. Appellant pled "not guilty" to the charged offenses of first and second degree murder.

Appellant, again testifying through an interpreter, began by describing her marriage to Jose. She testified that she and Jose married when she was fourteen years' of age. After their first child was born, Jose became verbally abusive and binge drink. Jose physically beat Appellant often, often in front of their children, up until the eldest was approximately fifteen. As newlyweds, Jose first began asking Appellant to view pornographic books with him. Later, Jose began taking Appellant to hotels where he would force her to watch pornographic films with him. Jose would subsequently get drunk and leave, leaving her to walk home. Appellant testified that she felt pressured to commit these acts since they were married. In 2009, Jose was arrested for a misdemeanor family violence assault after he beat Appellant. She later requested that prosecutors dismiss the case after Jose beseeched Appellant to do so.

In the early morning hours of September 24, 2014, Appellant arrived home from work and fell asleep. She was quickly awoken by Jose when he asked for the keys to the vehicle so that he could drive their grandson to school. After falling back to sleep, Appellant woke again to mow the lawn. Jose, after having taken their grandchild to school, returned sober to help her pick up

6

the cut grass.  Appellant thereafter went with her daughter to the store.  After returning from her daughter's house, she drank a beer at home.  At approximately 4:47 p.m. that afternoon, Appellant called her supervisor at work and left a message explaining that she would not be going to work at 11:00 p.m. that evening, as scheduled, since she had not slept.  She was then working as a housekeeper at a hospital.  She and Jose thereafter left to purchase some liquor and then returned home.  Appellant testified that she served herself a small amount of the liquor at which point Jose became very upset, grabbed her, threw her, and hit her face, rendering her unconscious.  It was the first time Appellant had been "knocked out."  She subsequently awoke on the sofa and noticed that Jose was sitting on the loveseat and not moving.  Using the top loop of an apron, she strangled Jose.  She thereafter went to bed.  Appellant maintained that she was unaware of how Jose developed the bruises and cuts later found on his face.  The next morning on September 25, Appellant found Jose's body cold on the loveseat.  Appellant called her son Ruben to alert him that Jose was not breathing.

Appellant's daughter-in-law and wife of her son Ruben, Valerie Roybal testified that she remembered Appellant and Jose arguing when Jose returned from taking her son (the Acevedo's grandchild) to school on September 24.  She overheard them yelling but could not understand since she was not fluent in Spanish.  That evening at approximately 7:30 p.m., she entered the Acevedo residence that evening to do laundry, as she did often.  Valerie saw Appellant unconscious on the floor, leaning on the long sofa.  She smelled alcohol and then asked Ruben to help Appellant since she would not usually sleep on the floor and it appeared as if she had been drinking.  Jose was sitting outside on a bench.  Valerie testified that Jose walked into the home and told Ruben to leave his mother as Ruben lifted her on to the long sofa.  Valerie and Ruben then went to the store and returned at approximately 9:00 p.m.  Valerie did not go back into the Acevedo residence since she

7

was afraid to upset Jose, stating that "[Jose] doesn't like me in there." That night, up until 3:00 a.m. when her husband left for work, she did not hear any arguing from the Acevedo residence. At approximately 6:15 a.m. the next morning, Ruben called Valerie to inform her about his father at which point Valerie rushed to the Acevedo residence and found Jose's body sitting up on the loveseat. After yelling Jose's name several times, she attempted to feel for a pulse and found his body was cold. She then called 9-1-1. The operator instructed Valerie to conduct cardiopulmonary resuscitation (CPR), however, Valerie explained that she was unable since Jose's body was stiff and cold. Valerie began chest compressions on Jose's body as the 9-1-1 operator had subsequently instructed, but was unsuccessful.

Valerie and Ruben's home adjoined the Acevedo residence and was separated by a hallway. Valerie explained that while she never observed Jose hit Appellant, she had seen him grab her as if "shaking someone to stop." Valerie also described how Appellant would have black eyes, cuts and bruises on her arms in Valerie's twenty-four years knowing Appellant and Jose. She stated that their relationship involved a lot of arguing—almost every weekend—and that she did not think "any woman would stay in a relationship like that in our day and age, but [Appellant] did."

Ruben, son of both Appellant and Jose, testified that he returned home from work on September 24 at approximately 6:00 p.m. On his way home, he saw his parent's car on road. Later that evening when he entered the Acevedo residence, he found Appellant "dazed out" leaning on the couch while walking along the side of the home. He testified that his father told him that he had punched Appellant and "knocked her out." Jose also told Ruben to "leave her, she's ugly" when he asked him what happened to his mother. While his father's statements were not in the written statement given to police, Ruben testified that his father, in fact, told him so and that he

8

had informed an investigator. He picked up Appellant and placed her on the couch. He later ate dinner and went to the store with his wife Valerie. Ruben testified that when he returned for the laundry Valerie had left in the laundry room, he could hear his father breathing. When he received the call from Appellant the next morning, he called his wife and asked her to check on his parents.

Ruben testified that Appellant and Jose often argued and that oftentimes, those arguments turned physical. He explained that his father was verbally abusive and would degrade his mother. Additionally, Ruben explained that his father, not his mother, would turn their arguments into physical altercations. There were occasions in which Ruben would "get in the middle" when their arguments escalated.

Margarete Bassett, a licensed professional counselor at a domestic violence and sexual assault institute, testified as an expert witness. Bassett testified regarding the range of behaviors that an abuser in an abusive relationship will use to entrap their partner to make their partner commit to the relationship. Based on her review of the relationship between Appellant and Jose, Bassett opined that Appellant felt trapped as if she could not leave the relationship. When asked as to why Appellant strangulated Jose, Bassett stated that "someone who's being abused retaliates violently," "typically in response to a threat." In addition, "the cumulative effect of all of the violence, all of the coercive controlling strategies," and Appellant's description that Jose had reached a violent pinnacle by knocking her out for the first time all led to her actions. Bassett opined that "for [Appellant], it had risen to a level of threat that threatened her life. [Appellant] could not confront [Jose]. She could not confront him one on one and protect herself."

A jury convicted Appellant and assessed punishment at twenty-five years' confinement and a $10,000 fine. The trial court sentenced Appellant in accordance with the jury's verdict. Appellant timely appealed.

**DISCUSSION**

Appellant contends that the trial court committed reversible error by omitting to include a voluntariness instruction in the jury charge in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. In her second issue, Appellant similarly maintains that the trial court committed reversible error by omitting to include a voluntariness instruction in the jury charge in violation the Texas Code of Criminal Procedure. Third, Appellant alleges the trial court committed reversible error by including incorrect instructions in the jury charge regarding the law on self-defense. In her fourth issue, Appellant contends that she was denied reasonably effective assistance of counsel.

### *Jury Charge Error*

In her first and second issues presented for review, Appellant complains that the trial court committed reversible error by failing to include a voluntariness jury instruction, citing three potentially different bases upon which a voluntariness point of error is analyzed: the Due Process clause of the U.S. Constitution, Article 38.22, section 6 of the Texas Code of Criminal Procedure, and Article 38.23 of the Texas Code of Criminal Procedure. *See* U.S. CONST. amend. VI; TEX.CODE CRIM.PROC.ANN. art. 38.22-23 (West 2018).

In her third issue, Appellant claims egregious harm because the trial court failed to properly instruct the jury on the law of self-defense. Appellant submitted a proposed jury charge to the trial court and, in an apparent agreement with the State, the voluntariness instruction was removed so that the expert witness (Margarete Bassett) could testify. Appellant's affirmatively requested the jury instruction that she now complains of in her third issue: the "duty to retreat" language in the abstract portion. As a sub-issue of her third issue, she asserts the trial court erred in omitting the Section 2.03(d) instruction in the abstract portion and both application paragraphs. TEX.PENAL

10

CODE ANN. § 2.03(d)(West 2011)("If the issue of the existence of a defense is submitted to the jury, the court shall charge that a reasonable doubt on the issue requires that the defendant be acquitted.").

*Standard of Review*

When resolving a challenge to the jury charge, we first determine whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex.Crim.App. 2005). If we find error, we analyze that error for harm under the applicable standard set out in *Almanza v. State*, 686 S.W.2d 157 (Tex.Crim.App. 1984)(op. on reh'g). *See Barrios v. State*, 283 S.W.3d 348, 350 (Tex.Crim.App. 2009). If, as here, the defendant did not object to the alleged error at trial, we will reverse only if the error is "so egregious and created such harm that the defendant 'has not had a fair and impartial trial.'" *Id.* (quoting *Almanza*, 686 S.W.2d at 171).

*Voluntariness Instruction*

*Oursbourne v. State* instructs us that Articles 38.21 and 38.22 "are broader in scope than those [claims of involuntariness] covered by the Due Process Clause or *Miranda*." 259 S.W.3d 159, 173-174 (Tex.Crim.App. 2008). So, we turn to Texas statutory law to properly evaluate the question of jury submission of an instruction on voluntariness. *Id.* at 173-74. There are "three types of instructions that relate to the taking of confessions: (1) a 'general' Article 38.22, § 6 voluntariness instruction; (2) a 'general' Article 38.22, § 7 warnings instruction (involving warnings given under § 2 and § 3); and (3) a 'specific' Article 38.23(a) exclusionary-rule instruction." *Id.* at 173. Further,

> It is the defendant's responsibility to delineate which type of 'involuntariness' he is claiming—a general (perhaps subjective) lack of voluntariness or a specific police-coerced lack of voluntariness—because the jury instruction is very different depending upon the type of claim.

11

> Obviously, the evidence must raise a 'voluntariness' issue, and the defendant should request a jury instruction that relates to his theory of involuntariness. But if the defendant never presents a proposed jury instruction (or fails to object to the lack of one), any potential error in the charge is reviewed only for 'egregious harm' under *Almanza*.

*Id.* at 174.

An Article 38.22, § 6 claim of involuntariness is triggered only—when a "question is raised" either by a party or by the trial court regarding an issue of the voluntariness of a confession. *Id.* at 175. Likewise, an Article 38.22, § 7 jury instruction on voluntariness is mandated only—when the issue is raised by the evidence. *Id.* at 176. An Article 38.23 jury instruction on voluntariness, on the other hand, is required only—when there is a genuine dispute about a material fact. *Id.* at 177 (citing *Madden v. State,* 242 S.W.3d 504, 510 (Tex.Crim.App. 2007). A trial court has a duty, sua sponte, to give an Article 38.23 voluntariness instruction if three requirements are met: "(1) evidence heard by the jury raises an issue of fact, (2) the evidence on that fact is affirmatively contested, and (3) the contested factual issue is material to the lawfulness of the challenged conduct in obtaining the statement claimed to be involuntary." *Contreras v. State,* 312 S.W.3d 566, 574 (Tex.Crim.App. 2010).

*Analysis*

In Appellant's opening statement, her counsel told the jury:

> We believe the evidence is going to show that this was not a tumultuous relationship between two people who like to drink and fight. What this was[,] was a relationship of 41 years of marriage involving a man who was controlling physically, psychologically, emotionally from the day – from the time when they married and lived in Juarez until the time they lived in California until – up until September of 2014.
> We believe the evidence is going to show that Ms. Acevedo did do things that you do when you're in an abusive relationship.

12

.     .     .

> We believe the evidence is going to show . . . my client, prior to this had had enough.

.     .     .

> The evidence is going to show . . . Mr. Acevedo did something that he had never done before, and that is, he beat her until unconsciousness. The evidence is going to show that he knocked her out. And when she awoke, we believe the evidence is going to show to you that she went and got her apron, and she put it around his neck, and she pulled it.

At trial, the State and Appellant agreed not to bring up before the jury any of the circumstances surrounding Appellant's second statement in which she inculpates herself which was litigated on her motion to suppress based on voluntariness. The Appellant, during the guilt stage, testified she killed her husband because "I was tired of him. And I was – I couldn't take anymore of that abuse that he was giving me." When questioned as to why she strangled her husband, Appellant replied "I was very tired of all the mistreatment and all of the abuse, I couldn't handle it anymore." Appellant physically demonstrated for the jury how she strangled her husband with the apron strings.

The State read to the jury a transcript in English of Appellant's first recorded interview in which she denied knowing what had happened to her husband. The English transcript of the second recorded interview was also read to the jury in which Appellant admitted to strangling her husband with the apron strings. Appellant's counsel objected to the introduction of each of the recorded statements based on voluntariness. The trial court overruled Appellant's objections. During the jury charge conference, Appellant's counsel agreed to the deletion of the voluntariness instruction the court had included in the proposed jury charge. The State and Appellant agreed to the removal of the voluntariness instruction if the domestic violence expert testified. The trial

13

court agreed to remove the voluntariness instruction.

Defense counsel in closing argument, stated:

> Because at this point, I don't believe there's any question that my client killed Jose Acevedo.
>
> .    .    .
>
> That's established. She got on the stand and she admitted.
>
> .    .    .
>
> [T]hen the next question you ask yourself is:  Was it justified?
>
> .    .    .
>
> We do know that he punched her in the mouth because we've got blistering.
>
> .    .    .
>
> Because when she wakes up from being knocked out, she goes, she gets her apron, she come back, and she strangles him. She doesn't wait. She doesn't cool off. There's no time for reflection.
>
> .    .    .
>
> And he hits her in the most violent – she says the most violent attack he's ever done.
>
> .    .    .
>
> [B]ecause she wakes up, gets an apron, and then strangles him. And in her mind – if he's hit me hard enough to knock me out, he's going to kill me next time or when he wakes up out of his stupor or for whatever reason.
>
> .    .    .
>
> This was as far as this abused woman could go.
>
> .    .    .
>
> And when you put yourself in her shoes and you look at her

experience, I believe that you can see this murder was justified, that there was an immediacy in her mind when she wakes up after being knocked out. There is an immediacy.

Clearly the issue of voluntariness was not raised by the evidence during the jury trial for an Article 38.22, § 7 instruction. In fact, quite the opposite, the State and Appellant agreed through a motion in limine not to litigate the issue of voluntariness at trial and they did not. Likewise, an Article 38.23 voluntariness instruction was not warranted because there was no genuine issue of a material fact presented to the jury regarding the voluntariness of her two recorded statements. Last, we do not find that the "question" was raised under Article 38.22, § 6. Appellant's trial strategy was to admit the killing but argue it was justified as self-defense. Obviously, Appellant was forced to choose between asserting the confession was coerced and false or the killing was justified. It cannot be both. If she wanted a self-defense instruction, she had to admit to the murder and bear the burden of her justification defense.

Assuming a voluntariness instruction was warranted, Appellant did not suffer egregious harm. Appellant freely testified and demonstrated to the jury how and why she killed her husband. The lack of a voluntariness instruction did not deprive her of a fair and impartial trial.

Issues One and Two are overruled.

*Self-Defense Instruction*

Appellant contends in her third issue that the trial court erred when it included language concerning her duty to retreat in the jury instruction. Specifically, Appellant complains that the language of the instruction erroneously imposed a duty to retreat on Appellant. In a sub-issue, Appellant also contends that the self-defense language in the application portion of the jury instruction improperly assigned the burden of proof by omitting the language of Section 2.03(d).

At trial, the State and Defense Counsel conferred on the court's charge and stated the

15

following:

> **State:** And I just want to point out for purposes of the record that roman numeral 4, which is the language regarding self-defense, and then the application paragraph for the wording for the jury to apply self-defense under roman numeral 7 came from the defendant's proposed jury charge of the Court. I don't know that it was filed. But the wording and the language and all of this came from the defendant in the defense proposed jury charge.
>
> **Defense:** That is correct, Your Honor. We sent the Court an e-mail with the proposed charge, and that is our charge. We were rather pleased with it.
>
> **Court:** Anything further from the State?
>
> **State:** No, Your Honor.
>
> **Court:** Defense?
>
> **Defense:** No, Your Honor.
>
> **Court:** In fact. [Defense Counsel], have you had a reasonable amount of time to review the charge of the Court, sir?
>
> **Defense:** I have, Your Honor.
>
> **Court:** Any objections?
>
> **Defense:** No objection.

The trial court's charge under Roman Numeral IV includes the following language "A person is justified in using deadly force only if a reasonable person in the actor's situation would not have retreated . . . ."[4] The court's charge under Roman Numeral VII included two application

---

[4] Before 2007, it was appropriate to instruct a jury that the defendant must have "reasonably believed that a reasonable person in the [defendant's] situation would not have retreated." *Morales v. State*, 357 S.W.3d 1, 4 (Tex.Crim.App. 2011). However, the Legislature revised the statute and because of those revisions, trial courts should no longer submit jury instructions on the "general duty to retreat," since those instructions are no longer authorized by statute. *Id.* at 5. In *Morales*, the jury instruction included language regarding the defendant's duty to retreat; the court

paragraphs which omitted the language of Section 2.03(d).[5]

Appellant acknowledges, in her brief, that "the record contains a strong suggestion that the trial court's instruction on self-defense was exactly as requested by defense counsel. Appellant specifically drafted and submitted to the trial court the portion of the jury charge now complained of: the "duty to retreat" language and the application paragraphs which she asserts did not contain the instruction mandated under Section 2.03(d).

Unlike the voluntariness issue, Appellant complains of "a trial court has no duty to instruct the jury on unrequested defensive issues . . . ." *Oursbourn*, 259 S.W.3d at 179 (*citing Posey v. State*, 966 S.W.2d 57, 60 (Tex.Crim.App. 1998). A defendant must timely request a defensive issue or object to its omission from the charge for it to be considered the law applicable to the case. *Oursbourn,* 259 S.W.3d at 179-80; *see also Williams v. State,* 273 S.W.3d 200, 223 (Tex.Crim.App. 2008)("[A] party can forfeit the right to complain about the omission of a defensive issue because the defensive issue must be requested before the trial court has a duty to place it in the charge, and so no 'error' occurs absent a request."). Here, Appellant offered the jury charge language that was used to instruct the jury in the trial court's charge.

---

concluded that it was error to provide additional instructions regarding the defendant's general duty to retreat, because those additional instructions were no longer "authorized by statute" and "constituted [improper] comments on the weight of the evidence." *Id.* at 6. We note that "the failure to retreat may be considered in determining whether a defendant reasonably believed that [her] conduct was immediately necessary to defend [herself]" and that a prosecutor "may argue that the failure to retreat as a factor in determining whether the defendant's conduct really was immediately necessary[.]" *Morales*, 357 S.W.3d at 5; *see also* TEX.PENAL CODE ANN. § 9.31(a)(West 2011)(force is justified "when and to the degree the actor reasonably believes the force is immediately necessary to protect" against unlawful force), § 9.32(a)(2)(West 2011)("when and to the degree the actor reasonably believes the deadly force is immediately necessary" to protect against deadly force or to prevent the imminent commission of specified violent crimes).

[5] When claiming self-defense, the defendant has the initial burden of producing *some* evidence triggering self-defense to justify submission of a self-defense instruction. *Zuliani v. State,* 97 S.W.3d 589, 594 (Tex.Crim.App. 2003)(*citing Saxton v. State,* 804 S.W.2d 910, 913 (Tex.Crim.App. 1991)). The State must then persuade the jury beyond a reasonable doubt the defendant did not act in self-defense. *Id.* (citing *Saxton,* 804 S.W.2d at 913-14).

17

The trial court is required to instruct the jury it must acquit the defendant if it has reasonable doubt on the existence of a defensive issue pursuant to Section 2.03(d). However, a defendant has the burden of producing some evidence to support a claim of self-defense. *Zuliani v. State,* 97 S.W.3d 589, 594 (Tex.Crim.App. 2003). The State has the burden of persuasion in disproving self-defense. *Saxton v. State,* 804 S.W.2d 910, 913 (Tex.Crim.App. 1991). This burden does not require the State to produce evidence refuting the self-defense claim; rather, the burden requires the State to prove its case beyond a reasonable doubt. *Id.* The penal code places the burden on the State to prove each element of the offense charged; it does not require the State to "negate the existence of a defense . . . ." TEX.PENAL CODE ANN. § 2.03(b).

The Court, in *Cadd*, made clear that if the Appellant requests a charge instruction, he is estopped to complain about it on appeal. *Cadd v. State,* 587 S.W.2d 736, 741 (Tex.Crim.App. 1979)(op. on reh'g)(appellate court held defendant in no position to complain about charge given because the defendant requested the charge); *Holmes v. State*, 140 Tex.Crim. 619, 146 S.W.2d 400, 403 (1940)(defendant objected to the wording of the charge, the wording was taken out, then defendant complained the wording was not in the charge, appellate court held defendant invited error and could not complain). Given that Appellant did not object to the trial court's jury charge, she did not preserve error, and, therefore, the egregious-harm standard would normally apply. *See Druery v. State*, 225 S.W.3d 491, 504 (Tex.Crim.App. 2007). But it does not apply here because the error was invited. *See Druery*, 225 S.W.3d at 505–06; *Prystash v. State*, 3 S.W.3d 522, 531 (Tex.Crim.App. 1999), *cert. denied*, 529 U.S. 1102, 120 S.Ct. 1840, 146 L.Ed.2d 782 (2000); *Capistran v. State*, 759 S.W.2d 121, 124 (Tex.Crim.App. 1982)(Op. on reh'g).

The Court of Criminal Appeals has applied invited error when the defendant "invites" the trial court to do something, the trial court does the act, and thereafter the defendant complains of

the trial court's action. *Kelley v. State*, 823 S.W.2d 300, 302 (Tex.Crim.App. 1992); *Capistran*, 759 S.W.2d at 124. Under the doctrine of invited error, if a party requests or moves the court to make an erroneous ruling, and the court rules in accordance with the request or motion, the party responsible for the court's action cannot take advantage of the error on appeal. *Prystash,* 3 S.W.3d at 531.

In *Druery*, the Court of Criminal Appeals found that the defendant "not only did not object to the omission of the lesser-included instruction" but also "affirmatively requested, after inquiry by the trial judge, that the lesser-included instruction not be given." *Druery,* 225 S.W.3d at 506. The court held the defendant "induced the alleged error of which he now complains." *Id.* The court explained that a defendant "may not now argue on appeal that the trial judge had a duty to *sua sponte* give the jury an instruction on the lesser-included offense of first-degree murder in the face of his specific request that the charge not be included." *Id.* Thus, because the appellant was "estopped from bringing this charge-error claim on appeal," the court would "not address whether the omission of and failure to *sua sponte* give the lesser-included instruction was erroneous or amounted to egregious harm." *Id.* Cf. *Vega v. State*, 394 S.W.3d 514, 520 n.21 (Tex.Crim.App. 2013)(where the court did not apply the invited error doctrine where the state and the court could not find the missing instruction was requested or objected to).

In the present case, Appellant was given the exact jury instruction she requested and is now trying to "benefit from an error that was committed at [her] behest." *Trejo v. State,* 280 S.W.3d 258, 260 (Tex.Crim.App. 2009); *Tucker v. State,* 771 S.W.2d 523, 534 (1988). Because Appellant is estopped from bringing this charge-error claim on appeal, we do not address whether the self-defense instruction was erroneous or amounted to egregious harm.

Issue Three is overruled.

19

**Ineffective Assistance of Counsel**

In a final issue, Appellant contends that if she is now estopped because of the invited error doctrine from complaining about the erroneous jury instruction regarding the law of self-defense, her trial counsel failed to provide reasonably effective assistance of counsel. Appellant's contention is that her trial counsel failed to render reasonably effective assistance when her trial counsel offered the jury instruction, used at trial, which included an incorrect self-defense instruction and language concerning her duty to retreat. Specifically, Appellant contends that the self-defense language in the application portion of the jury instruction improperly assigned the burden of proof and that the abstract portion of the instruction erroneously included a language requiring Appellant to retreat before using deadly force.

*Ineffective Assistance*

The United State Constitution guarantees the right to reasonably effective assistance of counsel in criminal prosecutions. U.S. CONST. amend. VI; *Strickland v. Washington*, 466 U.S. 668, 684–86, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984). Criminal defendants are not, however, entitled to a flawless performance from counsel; "isolated lapses or mistakes during the trial are not necessarily indicative of ineffectiveness." *Calderon v. State*, 950 S.W.2d 121, 128 (Tex.App.--El Paso 1997, no pet.)(*citing McFarland v. State,* 845 S.W.2d 824, 843 (Tex.Crim.App. 1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993). The defendant must show that counsel's performance was deficient, to the extent that counsel failed to function as the "counsel" guaranteed by the Sixth Amendment. *Jackson v. State,* 877 S.W.2d 768, 771 (Tex.Crim.App. 1994).

We review claims of ineffective assistance of counsel under the two-pronged inquiry set out in *Strickland*. We must decide whether counsel was actually ineffective—in other words, did

the appellant show, "by a preponderance of the evidence, that his counsel's representation fell below the objective standard of professional norms[?]" *Bone v. State*, 77 S.W.3d 828, 833 (Tex.Crim.App. 2002)(*citing Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064). We must also determine whether counsel's ineffective assistance prejudiced the defendant. *Id.* Stated another way, we must determine if the claimed error so undermines our confidence in the outcome of the trial that there is a reasonable probability that, but for counsel's error, the outcome of the proceeding would have been different. *Id.* "The two prongs of *Strickland* need not be analyzed in a particular order—the prejudice prong may be analyzed first and the performance prong second." *Ex parte Martinez*, 330 S.W.3d 891, 900 n.19 (Tex.Crim.App. 2011). Failure to make a showing under either prong defeats an ineffective assistance claim. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex.Crim.App. 2003).

Establishing a claim of ineffective assistance of counsel on direct appeal is difficult given that proving the claim often, though not always, involves adducing evidence not readily apparent in the record. *Rylander,* 101 S.W.3d at 110-11; *Andrews v. State*, 159 S.W.3d 98, 102 (Tex.Crim.App. 2005)(noting that habeas corpus proceedings are often the better avenue for relief on ineffective assistance of counsel claims, since additional extra-record evidence may be introduced and counsel can have the opportunity to explain thought processes); *cf. State v. Frias*, 511 S.W.3d 797, 811-12 (Tex.App.--El Paso 2016, pet. ref'd)(counsel's testimony at new trial hearing sufficient to allow court on direct appeal to determine counsel was ineffective). We indulge a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment[,]" [Internal quotations marks omitted] *Mallet v. State*, 9 S.W.3d 856, 866 (Tex.App.--Fort Worth 2000, no pet.), and generally, in the absence of affirmative record evidence, we will assume counsel's decisions in a given case

21

were strategic. *See Thompson v. State*, 9 S.W.3d 808, 813 (Tex.Crim.App. 1999)(allegation of ineffectiveness "must be firmly founded in the record" and "record must affirmatively demonstrate the alleged ineffectiveness").

## *Analysis*

Assuming the self-defense instruction was incorrect, that alleged error, standing only, did not deprive Appellant of "counsel" as contemplated by the Sixth Amendment. A review of the record reveals Appellant's self-defense was vigorously prosecuted by her counsel. In closing argument, the State did not argue the duty to retreat, only that Appellant had failed to show she acted in self-defense. No evidence was developed by either party regarding the duty to retreat. The record contains two references, other than the jury charge, the reading of it by the trial judge to the jury and the State reading the instruction once in closing argument.

Assuming Appellant's alleged error constituted a "deficient performance" under *Strickland*, the mere assertion of prejudice is insufficient. *See Ex parte Parra*, 420 S.W.3d 821, 828 (Tex.Crim.App. 2013)(applicant's conclusory assertion that he had demonstrated prejudice was insufficient to establish prejudice). Appellant has failed to demonstrate the outcome of Appellant's trial would have been different had the erroneous self-defense instruction had been correctly submitted and the duty to retreat language deleted. Accordingly, we find that Appellant has failed to establish how the incorrect deadly force self-defense instruction caused prejudice as required by *Strickland*. *See Newkirk v. State*, 506 S.W.3d 188, 198–99 (Tex.App.--Texarkana 2016, no pet.)(ineffective assistance of counsel claim failed because no *Strickland* prejudice where trial counsel did not request sudden-passion defense instruction during punishment phase of trial).

We overrule Appellant's final issue.

## CONCLUSION

Having overruled each of the issues on appeal, we affirm the trial court's judgment.

November 2, 2018

YVONNE T. RODRIGUEZ, Justice

Before Rodriguez, J., Palafox, J., and Larsen, Senior Judge
Larsen, Senior Judge (Sitting by Assignment)

(Do Not Publish)