**Opinion issued April 4, 2024**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-23-00071-CR

_____

**DARRICK CARRIERE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 182nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1719922**

---

## MEMORANDUM OPINION

Appellant Darrick Carriere was charged with aggravated assault with a deadly weapon for shooting his neighbor following an argument in the parking lot of their apartment complex. Appellant contended the complainant was the first aggressor and argued he shot the complainant in self-defense. The jury found Appellant guilty

of aggravated assault with a deadly weapon and assessed his punishment at sixteen years' confinement in the Institutional Division of the Texas Department of Criminal Justice.

In three points on appeal, Appellant argues (1) there is insufficient evidence supporting the jury's rejection of his self-defense claim, (2) the trial court abused its discretion by excluding extraneous evidence of the complainant's three prior criminal convictions for assault and a pending assault charge, and (3) his trial counsel provided him with ineffective assistance at trial by failing to request a defensive instruction on defense of a third person.

We hold there is sufficient evidence supporting the jury's rejection of Appellant's self-defense claim and that the trial court did not abuse its discretion by excluding extraneous evidence of the complainant's criminal history. We further hold that even if Appellant's trial counsel's representation fell below an objective standard of reasonableness, Appellant did not establish he was prejudiced by his trial counsel's failure to request a defensive instruction on defense of a third person. We affirm the trial court's judgment.

### Background

Appellant Darrick Carriere was arrested and charged with aggravated assault with a deadly weapon after he shot his apartment complex neighbor Christopher Katthage following an argument in the parking lot of their apartment complex.

Carriere pleaded not guilty. Carriere's defensive theory at trial was that Katthage was the first aggressor and he shot Katthage in self-defense.

## The Trial Testimony

**A.    Christopher Katthage**

Christopher Katthage, the complainant, lived in a ground floor apartment adjacent to the apartment complex's parking lot. Katthage, a forty-year-old former combat veteran, worked for a nonprofit urban farm when he was shot by Carriere. Two days before the shooting, Katthage saw Carriere and M.D.[1] move into an apartment about twenty yards from Katthage's backdoor.

Katthage testified he suffers from post-traumatic stress disorder ("PTSD") as a result of his time in the military. His PTSD makes it difficult for him to fall asleep. According to Katthage, he and his girlfriend went to bed between 10 and 10:30 p.m. the night he was shot.

At midnight, Katthage, who needed to be at work by 4:30 a.m., was in bed about to fall asleep when a black Chevy Camaro arrived and parked in the handicapped parking spot directly outside of Katthage's ground floor apartment.

---

[1]    Because M.D. was a minor when the shooting occurred, we refer to him by his initials. *See* TEX. R. APP. P. 9.10(a)(3), (b), (d); *see also Fernandez v. State*, 597 S.W.3d 546, 551 n.4 (Tex. App.—El Paso 2020, pet. ref'd) (using minor party's initials to protect her identity).

Katthage testified that the car's headlights were shining into his bedroom window and the car's engine was loud.

According to Katthage, he was "calm at first," but after the car had remained with its lights on and music blaring for almost half an hour, he started "getting curious" and he walked outside "to see if people were just hanging outside." A surveillance video captured by the apartment complex's security camera shows that the Camaro parked in front of Katthage's apartment right before midnight. At 12:23 a.m., Katthage walked over to the Camaro but saw no one connected to the car, so he waited for a minute for someone to return. Katthage, who acknowledged he is a "big guy," was wearing a ball cap and pants, but no shoes or shirt and he was not carrying anything with him. Katthage testified that he knew that car belonged to Carriere and M.D. and he wanted to tell them that their "car is loud as hell and your lights are on, it's shining in my window." Although he knew where Carriere and M.D. lived, Katthage thought it was safer to approach them in plain view in the parking lot, rather than at their apartment.

At 12:28 a.m., Katthage walked over to the Camaro again, looked inside the car, looked around for Carriere or M.D., and then walked over to his girlfriend's car, which was parked next to the Camaro. Three minutes later at 12:31 a.m., Katthage, who had been standing by his girlfriend's car, walked back over to the Camaro,

4

opened the driver's door, and reached inside.  He walked off camera less than a minute later.

At 12:33 a.m., Katthage walked back over and stood by the Camaro for less than a minute.  As Katthage was standing there, a white Acura arrived and parked across from and about five parking spaces away from the Camaro.  At 12:35 a.m., Carriere walked over to the Camaro, reached inside the car, and opened the trunk.  Katthage testified that he heard the car's engine turn off and then come back on again and he thought to himself, "So, I was like, [t]hey're out there now.  Now is my chance to go talk to them."

Katthage walked over to Carriere, who was standing by the car.  According to Katthage:

> And it wasn't even a heated argument.  I was a little perturbed.  I was like, Man, can you guys at least turn your engine or your lights off if you plan on parking your car here?  You know, it's like midnight and people live here.  And immediately I was met with just, you know, You ain't going to be talking to me like that.  Get out of my face.  Punk ass white boy.

Katthage admitted he was angry and his "tone was definitely perturbed" when he first approached Carriere, but he denied threatening Carriere or "cursing or anything."  According to Katthage, he was standing about two feet away from Carriere when Carriere started walking towards him with a towel wrapped around his hand.  Katthage testified that Carriere stuck the towel in his face "and told me to back up out of his face unless I wanted some.  And that's when [Carriere] had his

hand on his shirt and I could see his pistol grip." Katthage testified, "When he stuck his towel in my face and showed me the pistol grip in his pocket right here. That's when I knew there was a gun."

Katthage testified that "at that point [M.D.] was coming from across the way from my back." According to Katthage, M.D. "stuck his hand in his pocket and [was] just mouthing off. So, I know there's two guns." Katthage testified that he pushed M.D. after he saw M.D. "pull out the weapon." When asked if he felt threatened, Katthage testified that he was "uneasy" at first, but he was not worried about Carriere initially because Carriere had only shown him the pistol. But when M.D. walked up from behind Katthage "with his hand on his gun talking about shooting me, that's when things started in my head lighting up a little bit."

Katthage testified that after he pushed M.D., M.D. "got a gun brandished in his hand walking back over towards me. But now I'm in [Carriere's] face." According to Katthage, M.D. was "[j]ust verbalizing that he was going to shoot me, and then pacing back and forth with the gun in his hand." Katthage testified he was "weirded out that these two young kids want[ed] to fight me and pull[ed] a gun out on me for asking them to be courteous." M.D. walked back towards Katthage, who pushed M.D. again and "called him a punk ass kid." According to Katthage, M.D. was walking in "circles waiving his gun around." Katthage, who denied threatening Carriere, testified he was not worried about Carriere because Carriere had only

6

"showed me he had a gun and talked about a gun," but he had not "stuck his hand on his gun." According to Katthage, he was in "disbelief that it escalated that high and they pulled guns on me for asking them to turn their lights off."

Katthage testified that he told Carriere, "Just turn off your f'ing lights and your car if you plan on parking here. It's midnight and people want to sleep." And "[e]verybody walked their separate ways." Katthage testified that M.D. was in the parking lot "still waving his gun, talking all kinds of nonsense, screaming." Katthage, who thought the incident was finished, walked back towards his apartment. According to Katthage, Carriere, who presumably was also walking back to his apartment, was walking on the concrete pathway a few feet away from Katthage, who was walking on the grass towards his apartment. Katthage testified that Carriere had "his hand on his gun. And he's just mouthing off, mouthing off, mouthing off, saying all kinds of stuff, you know, trying to egg me on into a fight to turn around."

Katthage testified that he was trying to ignore Carriere, and he kept walking towards his apartment. Katthage did not respond to Carriere's taunts until Carriere said, "I see that little pretty thing of yours," referring to Katthage's girlfriend. Katthage, who had just reached his apartment's door, turned around, and walked off his patio. Katthage testified that he knew Carriere had been walking behind him on the pathway, but he did not know where Carriere was standing. Katthage looked to

7

his right, towards the parking lot, and Carriere, who was standing to the left of Katthage, shot Katthage four times. Katthage fell to the ground, screaming in agony, and crawled towards his apartment. Carriere shot Katthage four more times while Katthage was on the ground and crawling towards his apartment.

Katthage testified that two officers arrived at his apartment within minutes of the shooting and an ambulance arrived about sixteen minutes later to take him to the hospital. Katthage flatlined at the hospital. After seventeen surgeries, forty-two days in a coma and a four-month hospital stay, he survived with life-altering injuries.

On cross-examination, Katthage denied he was the "aggressor" because, in his opinion, an "aggressor would be somebody who shows somebody else a weapon and says, I am going to shoot you. That's an aggressor."

## B. Officer Diosi Soto and Detective Brian Godoy

Officer Diosi Soto with the Houston Police Department testified that he was dispatched to the scene of Katthage's shooting and when he arrived, he saw Katthage lying on his living room floor. Officer Soto testified that Katthage told him the shooter "lived on the bottom floor across the way." Officer Soto's role was to collect and preserve evidence, including the videos and the shell casings found at the scene. On cross-examination, Officer Soto testified that he would agree that Katthage was a "very large man" and "very muscular."

8

Detective Brian Godoy with the Houston Police Department, who was assigned to investigate Katthage's shooting, testified that the black Camaro was registered to Carriere. Katthage identified Carriere from a photo array as the shooter. Detective Godoy testified that he and his partner met with Katthage at the hospital three days later. According to Detective Godoy, Katthage was "in a lot of pain" and had "just come out of sedation." Katthage did not initially tell Detective Godoy that he had shoved Carriere and M.D., but he later clarified "to the extent of his interaction with those two individuals." On cross-examination, Detective Godoy testified that he did not interview M.D. and he would be "surprised to find out that he was willing to cooperate and be interviewed."

## C.    M.D.

M.D. testified he was sixteen years old when the shooting occurred. M.D. testified he was working as a Door Dash driver that evening. After work, he drove to the apartment complex where he shared an apartment with Carriere. When he got out of his car, M.D. saw Katthage walk up to Carriere in the parking lot. M.D. testified that Katthage did not have a shirt or shoes on, and he did not see Katthage with any weapon.

M.D. first approached Carriere and Katthage with the intent "to deescalate the situation because I had seen [Katthage] yelling." According to M.D., Katthage's voice was raised, and he was "very aggressive." "He just wouldn't, like, stop coming

9

at us, just wouldn't stop talking and yelling at us." M.D. had a BB gun pistol with him the night of the shooting, but he denied pointing the gun at Katthage when he first approached him in the parking lot. M.D. testified he did not remove the BB gun pistol from his pocket until after Katthage pushed him in the back and slapped his head. According to M.D., Katthage pushed him in the chest, and "when I turned my back, I was pushed in my back and slapped in the back of my head." M.D. did not fall "but my slipper came off which made me stumble." While he did not suffer any serious injury, M.D. testified he "almost los[t] [his] breath."

M.D. saw Katthage push Carriere "multiple times" and "get pushed against the car." M.D. said he did not want to fight Katthage, who was larger than he was, because he knew Katthage would win. According to M.D., Katthage "had an anger problem," and he claimed to have seen Katthage "pushing his girlfriend around."

M.D. testified that Katthage continued to yell about the car as Katthage and Carriere walked off towards their apartments. Carriere was walking on the sidewalk. M.D. overheard Carriere telling Katthage, "Don't you ever touch me again. Don't you put your hands on me." Carriere also told Katthage not to put his hands on M.D. M.D. testified that Katthage briefly walked into his apartment, stood by his apartment door, then quickly walked back outside, and "kind of charged up like he was going to attack." M.D. testified Carriere then shot Katthage "probably a couple" of times and M.D. ran away after the shooting because he was "afraid of Mr.

10

Katthage and what he was going to do." M.D. did not call 911 or an ambulance. Later that night, M.D. spoke to the police. They asked him how he was doing and "left me alone." He did not tell the police then that Carriere shot Katthage.

**D.    Surveillance Videos**

Surveillance videos captured by the apartment complex's security camera and another resident's motion-activated security camera were admitted into evidence.[2] The videos, which do not have audio, were shown to the jury during Katthage's and M.D.'s testimony.

The apartment complex's surveillance video shows Carriere parked his car in the handicapped spot outside of Katthage's apartment at around midnight. The video shows Carriere running off screen, leaving the car's engine running and its headlights on. Twenty minutes later, Katthage is seen walking outside towards the car. Katthage, who is wearing a ball cap and pants and does not appear to have anything in his hands, waits for a few minutes before walking off screen. The video shows that Katthage returns to the car three times over the next few minutes, apparently looking for the owner of the car. After Katthage walks away from the car one last time, Carriere is seen back on camara running over to his car and getting something out of the trunk.

---

[2]    The surveillance video captured by the apartment complex's security camera is sped up and does not reflect the actual speed of events. The video captured by another resident's motion-activated security camera is at normal speed.

11

The video then shows Katthage approaching Carriere in the parking lot as M.D. is getting out of his car. Carriere raises his hand and waives something in Katthage's face. M.D., who minutes earlier had parked his car in the same parking lot a few parking spots over and across from Carriere's car, is seen walking over to where the men are talking and pointing at Katthage. Katthage extends his arm towards M.D. and then shoves M.D. in the chest with both hands. Although Katthage at first follows M.D. as M.D. backs away into the parking lot and away from Carriere's car, Katthage stops and returns to Carriere and his car. Katthage shoves Carriere in the chest, knocking Carriere back against his car. M.D. who is several feet away from Carriere's car in the parking lot, approaches the men again. Katthage turns towards M.D. and starts walking towards him in the parking lot. Katthage pushes M.D. from behind and while M.D. appears to stumble, he does not fall. Katthage then walks back over to Carriere, says something to Carriere, and then Katthage and Carriere walk offscreen. M.D., who again walks in the direction of Katthage and Carriere, apparently sees something off camera when he reaches a grassy area near Carriere's car and runs away. Carriere runs to his car a few seconds later and drives away.

The video recorded by the resident's motion-activated security camera shows Katthage walking on the grassy area near the parking lot back to his ground-floor apartment while Carriere walks parallel to Katthage on the concrete pathway,

12

presumably on his way to his apartment. Carriere is several feet away and watching Katthage. When Katthage reaches the open doorway to his apartment, he stops for a moment, partially walks in, turns back around, and then starts walking towards where Carriere is standing. Carriere, who is slightly off camera, shoots Katthage several times, causing Katthage to fall immediately to the ground. Carriere walks closer to Katthage, and shoots at him several more times as Katthage is crawling towards his apartment. M.D., who is still in the parking lot, is seen running off when Katthage is shot. Carriere is seen running to his car and driving off.

## E.    Jury Charge[3]

The charge included a self-defense instruction. In his closing, Carriere's counsel argued the jury should find Carriere not guilty based on self-defense. According to Carriere's counsel, Katthage, who assaulted Carriere and M.D., was the first aggressor and Carriere, who was the first to walk away after the altercation with Katthage, attempted to deescalate the situation. According to his counsel, Carriere reasonably believed it was immediately necessary for him to use deadly force against Katthage because Katthage, who was much bigger than Carriere and M.D., was "steaming, fuming" waiting for them to return to the Camaro, and

---

[3]    During the portion of the charge conference that was held on the record, the State and Carriere's counsel informed the trial court that they had reviewed the prior drafts of the charge and "concluded on an acceptable version." Carriere's counsel did not make any objections to the charge.

13

although Carriere complied with Katthage's request to turn off the Camaro's engine and lights, Katthage still assaulted both men. Carriere's counsel argued that Carriere's safety was jeopardized the "moment Mr. Katthage puts his hand on him, and it's back in jeopardy the moment Mr. Katthage steps out of his apartment and charges directly toward him."

The jury found Carriere guilty of aggravated assault with a deadly weapon and assessed his punishment at sixteen years' confinement in the Institutional Division of the Texas Department of Criminal Justice.

## Self-Defense

In his first issue, Carriere argues there is insufficient evidence supporting the jury's rejection of his self-defense claim. He argues that because Katthage was a "large man fueled by anger" who could "kill a much smaller man . . . with his hands in an instant," a reasonable person under the same circumstances would have believed that the use of deadly force against Katthage was immediately necessary to protect himself from Katthage's use or attempted use of unlawful force. The State responds that Carriere was not entitled to a self-defense instruction because there is no evidence of Carriere's subjective state of mind at the time of the shooting. And even if he were entitled to the defense, the evidence is legally sufficient to support the jury's verdict because there is no evidence that Katthage, "an unarmed [and]

14

shirtless man [who was standing] several feet away from Carriere," used or threatened deadly force when Carriere shot him.

## A.  Standard of Review

"A defendant is entitled to a jury instruction on self[-]defense if the issue [of self-defense] is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense." *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017) (citing *Elizondo v. State*, 487 S.W.3d 185, 196 (Tex. Crim. App. 2016)); *see also Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) ("The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue."). "Raised by the evidence" means "there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that th[e] element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007).

To raise self-defense, there must be evidence in the record showing that the defendant's subjective intent matched up with the statutory requirements. Evidence of a violent act against the defendant does not raise an inference of self-defense if the record is silent about the defendant's subjective state of mind at the time of the shooting. *Lozano v. State*, 636 S.W.3d 25, 34 (Tex. Crim. App. 2021).

15

A defendant has the burden of producing some evidence to support a claim of self-defense. *See Braughton*, 569 S.W.3d at 608 ("The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue."); *see also London v. State*, 325 S.W.3d 197, 202 (Tex. App.—Dallas 2008, pet. ref'd). The State bears the burden of persuasion to negate self-defense. *See Braughton*, 569 S.W.3d at 608; *see also Rankin v. State*, 617 S.W.3d 169, 182 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd). The State's burden, however, "is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt." *Braughton*, 569 S.W.3d at 608 (quoting *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)).

A jury's guilty verdict is an implicit finding rejecting the defendant's self-defense theory. *London*, 325 S.W.3d at 202. We review both legal and factual sufficiency challenges to the jury's rejection of self-defense under the *Jackson v. Virginia* standard. *Rankin*, 617 S.W.3d at 182 (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). Under that standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *Rankin*, 617 S.W.3d at 182. Viewed in the light most favorable to the verdict, the evidence is insufficient under this standard when either

16

(1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense; or (2) the evidence conclusively establishes a reasonable doubt. *Jackson*, 443 U.S. at 314, 319 n.11; *Rankin*, 617 S.W.3d at 182. An appellate court "may not re-evaluate the weight and credibility of the record evidence and thereby substitute [its] own judgment for that of the fact finder." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

We defer to the jury to "fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Rankin*, 617 S.W.3d at 182 (internal citations omitted); *Mitchell v. State*, 590 S.W.3d 597, 604 (Tex. App.—Houston [1st Dist.] 2019, no pet.). Because self-defense is a fact issue to be determined by the jury, the jury may accept or reject any defensive evidence on the issue. *Mitchell*, 590 S.W.3d at 604 (citing *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991)). Where "there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Braughton*, 569 S.W.3d at 608. We presume the "factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Rankin*, 617 S.W.3d at 182.

## B. Applicable Law

A person commits aggravated assault with a deadly weapon if he intentionally, knowingly, or recklessly causes bodily injury to another and uses or

17

exhibits a deadly weapon during the commission of the assault. TEX. PENAL CODE § 22.02(a). The use of deadly force in self-defense or in defense of another is a defense to prosecution for aggravated assault with a deadly weapon if the use of deadly force is "justified." *See id.* §§ 9.02, 9.31–.32.

Section 9.31(a) of the Penal Code states that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). The phrase "reasonably believes" "contains subjective and objective components." *Lozano*, 636 S.W.3d at 32. "A defendant must subjectively believe that another person used or attempted to use unlawful force . . . against the defendant and that the defendant's use of unlawful or deadly force in response was immediately necessary." *Id.* The defendant's subjective belief, however, must be objectively reasonable. *See id.* The reasonableness of the defendant's subjective belief is measured by the objective standard of an "ordinary and prudent man." *See id.* (quoting TEX. PENAL CODE § 1.07(a)(42)); *see also* TEX. PENAL CODE § 1.07(a)(42) (defining "reasonable belief" as one held by "an ordinary and prudent man in the same circumstances as the actor").

Section 9.32(a) of the Penal Code provides that a person's use of deadly force is justified "if the actor would be justified in using force against the other under

Section 9.31" and "when and to the degree the actor reasonably believes the deadly force is immediately necessary:"

> (A)    to protect the actor against the other's use or attempted use of unlawful deadly force; or
>
> (B)    to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

TEX. PENAL CODE § 9.32(a).

**C.    Analysis**

Carriere does not dispute the sufficiency of the evidence supporting the jury's finding he committed the charged offense. We thus focus our analysis on whether the jury would have found against Carriere on the self-defense issue beyond a reasonable doubt. *See Braughton*, 569 S.W.3d at 608.

Carriere argues there was no "disproof of the self-defense claim" and that "it was perfectly appropriate to have shot the complainant" because he "was facing a much larger belligerent, who acknowledged three separate assaults of the two []people involved, who was shown a weapon to deter him but continued to assault the defendant and the young boy, and who turned and charged yet again . . . ." He argues that a "large man fueled by anger can kill a much smaller man or boy with his hands in an instant, perhaps not even intentionally." Thus, he contends that a reasonable person under the same circumstances would have believed that the use

19

of deadly force against Katthage, a "large man fueled by anger," was immediately necessary to protect himself from Katthage's use or attempted use of unlawful force.

The State responds that Carriere's first issue is fatal because there is no evidence of Carriere's subjective belief. We agree. "Typically, the 'ordinary and prudent person' standard is meant to operate as a limitation on defendants who harbor unreasonable beliefs that the use of deadly force was immediately necessary." *See Lozano*, 636 S.W.3d at 33. But satisfaction of the "ordinary and prudent person" standard does not "obviate[] the need for the evidence to show that a defendant actually believed that the use of deadly force was immediately necessary." *Id.* Here, there is no evidence of Carriere's state of mind when he shot Katthage. Consequently, his first issue on appeal fails. *See id.* at 34 (holding evidence of violent act against defendant does not raise inference of self-defense if record is silent about defendant's subjective state of mind at time of shooting).

Even assuming the jury could infer that Carriere believed Katthage was using or attempting to use unlawful force against him and that Carriere's use of deadly force against Katthage was immediately necessary, a rational jury could have found that Carriere's belief was not objectively reasonable. *See id.* at 32 (stating that defendant's subjective belief that use of deadly force is immediately necessary must be objectively reasonable). Carriere argues that his use of deadly force was objectively reasonable because Katthage was a much larger man "fueled by anger"

20

who "charged yet again" when Carriere shot him. We have previously rejected similar arguments in support of the objectively reasonable standard.

In *Harris v. State*, we rejected the argument that a complainant's large physical stature alone compels the conclusion that the defendant's subjective belief that use of deadly force was immediately necessary was objectively reasonable. 668 S.W.3d 83, 90 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd). In *Harris*, the complainant, Valentine, arranged to buy drugs from the defendant and his acquaintance. *Id.* at 89. After counting Valentine's money, the defendant announced the money was short, packed up the drugs, and began leaving the apartment. Valentine "grabbed the front of [the defendant's] shirt, and pushed him against the wall." *Id.* at 89. The defendant "drew his gun from his waistband, and, as Valentine turned, possibly reaching for his own gun, [the defendant] shot him in the back of the head, immediately incapacitating him." *Id.* The defendant argued on appeal that the evidence was insufficient to support his conviction for murder because the State failed to prove beyond a reasonable doubt that he did not act in self-defense when he shot Valentine. *Id.* at 88. According to the defendant, Valentine was six feet tall and almost 300 pounds and his large, imposing size "supports a finding that appellant reasonably believed that deadly force was immediately necessary when Valentine pushed [the defendant] against the wall." *Id.* at 90 & n.4. We rejected this argument holding that:

Valentine's large physical stature does not compel—and does not even necessarily support—a finding that appellant reasonably believed deadly force was immediately necessary to protect himself from Valentine, especially considering that appellant was armed. Whether Valentine's size justified a reasonable belief that deadly force was immediately necessary was a question for the jury—a question the jury resolved in favor of the State, not appellant.

*Id.*[4]

The jury heard conflicting testimony from Katthage and M.D. about the confrontation in the parking lot. The confrontation was captured on the surveillance videos submitted into evidence. The evidence reflects that Katthage was unarmed, while Carriere was carrying a handgun and M.D. had a BB gun pistol. M.D., who denied that he or Carriere threatened Katthage, testified that Katthage was "very aggressive" and he "just wouldn't, like, stop coming at us, just wouldn't stop talking and yelling at us." M.D. testified he had seen Katthage push his girlfriend before, and he was scared of Katthage, who M.D. believed had anger issues.

Katthage testified he was calm at first and although he became angry, he did not curse at Carriere or threaten him or M.D. And while he admitted to pushing

---

[4] The defendant also argued the evidence demonstrated he reasonably believed that Valentine might use or attempt to use unlawful deadly force against him because "Valentine was armed with a handgun and prepared to take the drugs by force." *Harris v. State*, 668 S.W.3d 83, 89 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd). We held a rational jury could have found the defendant did not reasonably believe that the use of deadly force was immediately necessary to protect himself against Valentine's use or attempted use of his firearm or other deadly force because there was no evidence the defendant knew that Valentine was carrying a gun and prepared to take the drugs by force. *Id.*

22

Carriere and M.D., this evidence alone is insufficient. *See generally Rankin*, 617 S.W.3d at 183 (holding use of deadly force was not immediately necessary when unarmed complainant grabbed and choked defendant, because defendant freed herself from complainant's grasp and could have "easily retreated to her apartment across the street" before stabbing complainant); *Mitchell*, 590 S.W.3d at 604–05 (holding use of deadly force not immediately necessary when unarmed complainant let go of defendant before defendant picked up gun and fired at complainant); *Bundy v. State*, 280 S.W.3d 425, 435 (Tex. App.—Fort Worth 2009, pet. ref'd) (holding defendant's use of deadly force was not justified in response to complainant's attempt to punch defendant one time because complainant's use of force did not constitute deadly force); *Reed v. State*, No. 01-13-00208-CR, 2014 WL 4345124, at *4 (Tex. App.—Houston [1st Dist.] Aug. 29, 2014, no pet.) (mem. op., not designated for publication) (stating "the testimony only reflects that [the complainant] pushed appellant to the floor which does not typically constitute deadly force"); *see also Patterson v. State*, No. 01-94-00615-CR, 1996 WL 283252, at *2 (Tex. App.—Houston [1st Dist.] May 30, 1996, pet. ref'd) (mem. op., not designated for publication) (stating complainant's "act of shoving appellant was not a use of deadly force").

The video reflects that Katthage, who believed the confrontation was over, was walking away from the parking lot and towards his apartment while Carriere

23

was walking separately on the paved pathway towards his apartment. Katthage testified he had his back to Carriere, and he turned around only after Carriere told him something about his girlfriend. At that point, Carriere shot Katthage several times, causing Katthage to fall to the ground. Katthage was on the floor crawling towards his apartment and screaming in pain, when Carriere shot at him again several times. Katthage was unarmed. M.D., who was standing in the parking lot away from Carriere and Katthage, ran away when Carriere shot Katthage.

As we held in *Harris*, it was the province of the jury to determine from the surveillance videos and the testimony whether Katthage's size and his alleged violent and aggressive conduct towards Carriere and M.D. justified a reasonable belief in Carriere that use of deadly force was immediately necessary. *See Saxton*, 804 S.W.2d at 913–14 (stating credibility of defensive evidence is "solely within the jury's province and the jury is free to accept or reject the defensive evidence"); *Braughton*, 569 S.W.3d at 610–11 (holding jury could have rationally determined defendant did not have "reason to believe" his use of deadly force against complainant was immediately necessary when complainant did not have weapon and had "ceased using physical force," and noting "jury was presented with two conflicting views of the events that occurred that night, and it had to decide the case based on which view it determined was more credible").

Based on the record before us, we conclude a jury rationally could have found beyond a reasonable doubt that Carriere committed aggravated assault when he shot Katthage and that Carriere's purported belief that his use of deadly force against Katthage was immediately necessary was not objectively reasonable, thus rejecting Carriere's self-defense claim. *See Lozano*, 636 S.W.3d at 32 (stating "reasonably believes" contains subjective and objective components and defendant's subjective belief that use of deadly force is immediately necessary must be objectively reasonable).

We hold there was sufficient evidence supporting the jury's rejection of Carriere's claim of self-defense. We overrule Carriere's first issue.

**Katthage's Extraneous Bad Acts and Offenses**

In his second issue, Carriere argues the trial court abused its discretion by excluding extraneous evidence of Katthage's prior misdemeanor assault convictions and a pending assault charge because the evidence was admissible to prove that Katthage was the first aggressor. The State argues the trial court did not abuse its discretion by excluding this evidence because Katthage's behavior toward Carriere and M.D. was unambiguous and needed no explanation.

**A.    Standard of Review and Applicable Law**

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016). A

25

trial court abuses its discretion when its decision falls outside the zone of reasonable disagreement, that is, when the decision is "so clearly wrong as to lie outside the zone within which reasonable people might disagree." *Id.* at 83 (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008)).

Evidence of a person's character or character trait is generally not admissible to prove that on a particular occasion the person acted in conformity with that character or trait. TEX. R. EVID. 404(a)(1). In a criminal case, however, evidence of a complainant's character for violence is admissible if it has relevance apart from the tendency to show character conformity, such as to show that the complainant was the first aggressor. *See Torres v. State*, 71 S.W.3d 758, 760–61 (Tex. Crim. App. 2002); *London*, 325 S.W.3d at 205. Evidence of a complainant's extraneous violent conduct is admissible to show the complainant was the first aggressor and thus a claim of self-defense is supported only if (1) there is some ambiguous or uncertain evidence of a violent or aggressive act by the complainant that tends to show the complainant was the first aggressor; and (2) the proffered evidence tends to dispel the ambiguity or explain the complainant's conduct. *Mai v. State*, 189 S.W.3d 316, 321 (Tex. App.—Fort Worth 2006, pet. ref'd); *see London*, 325 S.W.3d at 205; *Reyna v. State*, 99 S.W.3d 344, 347 (Tex. App.—Fort Worth 2003, pet. ref'd); *see also Torres*, 71 S.W.3d at 761 (stating that, for purpose of proving complainant was first aggressor, proffered evidence must explain complainant's conduct). A trial

court is thus "within its discretion to exclude [evidence of the complainant's] prior violent acts if the victim's conduct was plainly aggressive." *Smith v. State*, 355 S.W.3d 138, 150–51 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

## B.    Analysis

The record reflects that prior to the shooting, Katthage, who was upset Carriere had left his car's engine running with its headlights on in the parking lot late at night, confronted Carriere when he returned to his car. When M.D. intervened, Katthage shoved M.D. in the chest and briefly followed M.D. into the parking lot when he backed away. Katthage then returned to Carriere and shoved him against the car. After M.D. tried to intervene again, Katthage followed M.D. into the parking lot and shoved M.D. from behind, causing M.D. to lose his balance and almost fall to the ground.

We agree with the State that Katthage's acts of shoving Carriere and M.D. were unambiguous acts of violence and aggression that needed no explanation. *See Reyna*, 99 S.W.3d at 347 (holding complainant's extraneous act was not admissible to show first aggressor because complainant's act of flashing gun was unambiguously aggressive and needed no explanation); *see also Smith*, 355 S.W.3d at 151 (reaching same holding when complainant "pulled a knife and attempted to stab him first—both unambiguous acts of aggression and violence that need no explanation"); *Mai*, 189 S.W.3d at 321 (reaching same holding when complainant

27

jumped on defendant's back and pulled defendant's hair out); *London*, 325 S.W.3d at 205 (reaching same holding when defendant shot at defendant's car).  Because of the unambiguous nature of Katthage's conduct, we conclude the trial court was within its discretion to exclude the evidence of Katthage's prior misdemeanor assault convictions and pending assault charge because such evidence did not have relevance apart from the tendency to show character conformity.  *See* TEX. R. EVID. 404(b); *Smith*, 355 S.W.3d at 151.

We overrule Carriere's second issue.

### Ineffective Assistance of Counsel

In his third issue, Carriere argues his trial counsel provided him with ineffective assistance of counsel by failing to request a defensive instruction on defense of a third person.  According to Carriere, there was sufficient evidence to justify the instruction because Carriere was also acting in defense of M.D. when he shot Katthage.  The State argues Carriere failed to show that his trial counsel's representation fell below an objective standard of reasonableness because (1) there was no evidence of Carriere's subjective belief at the time of the shooting and thus Carriere was not entitled to an instruction defense of a third person, and (2) even if Carriere were entitled to an instruction on defense of a third person, Carriere's trial counsel could have had a strategic reason for not requesting the instruction.

**A. Standard of Review and Applicable Law**

The Sixth Amendment of the United States Constitution guarantees an accused the right to reasonably effective assistance of counsel in criminal prosecutions. U.S. CONST. amend. VI; *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). To determine whether an appellant has established a claim for ineffective assistance of counsel, we utilize the two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Lopez*, 343 S.W.3d at 142.[5]

To prevail under the *Strickland* analysis, the appellant must establish by a preponderance of the evidence that (1) counsel's representation fell below an objective standard of reasonableness, and (2) but for the deficient performance, there is a reasonable probability the result of the proceeding would have been different. *Id.* (citing *Strickland*, 466 U.S. at 689). To show a trial counsel's performance was deficient based on the failure to request a jury instruction, the appellant must show he was entitled to that instruction. *Washington v. State*, 417 S.W.3d 713, 726 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). "'Reasonable probability' is a 'probability sufficient to undermine confidence in the outcome,' meaning 'counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result

---

[5] Texas adopted the *Strickland* test in *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986).

is reliable.'" *Smith v. State*, 286 S.W.3d 333, 340 (Tex. Crim. App. 2009) (quoting *Strickland*, 466 U.S. at 687, 694).

The *Strickland* factors are "judged by the 'totality of the representation,' not by counsel's isolated acts or omissions, and the test is applied from the viewpoint of an attorney at the time he acted, not through 20/20 hindsight." *Ex parte Jimenez*, 364 S.W.3d 866, 883 (Tex. Crim. App. 2012) (citing *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990)); *see also Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). There is a strong presumption that a trial counsel's conduct falls "within the wide range of reasonable assistance," and that counsel's decisions were motivated by sound trial strategy. *Ex parte Jimenez*, 364 S.W.3d at 883 (citing *Ex parte White*, 160 S.W.3d 46, 51 (Tex. Crim. App. 2004) (quoting *Strickland*, 466 U.S. at 689)); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005) (holding courts indulge "strong presumption that counsel's conduct fell within a wide range of reasonable representation"). "The mere fact that another attorney might have pursued a different tactic at trial does not suffice to prove a claim of ineffective assistance of counsel." *Ex parte Jimenez*, 364 S.W.3d at 883 (citing *Ex parte Miller*, 330 S.W.3d 610, 616 (Tex. Crim. App. 2009)).

An appellant bears the burden to establish both prongs of the *Strickland* analysis. Failure to satisfy one prong of the *Strickland* test negates an appellate court's need to consider the other prong. *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *see Lopez*, 343 S.W.3d at 142 ("Unless appellant can prove both prongs, an appellate court must not find counsel's representation to be ineffective.").

## B. Analysis

Carriere argues his trial counsel "missed the boat entirely" by failing to request an instruction on defense of a third person. Under Section 9.33 of the Texas Penal Code, "[a] person is justified in using force or deadly force against another to protect a third person" if:

> (1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and
>
> (2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.

TEX. PENAL CODE § 9.33.

Carriere generally refers to "the State[-]sponsored testimony of [Katthage], the State[-]offered video of the assaults committed by the complainant, [and] the [S]tate[-]sponsored testimony of the young delivery boy" in support of his argument

31

that Carriere's trial counsel should have requested an instruction on defense of a third person. He states, "[E]ven if one might not point a sympathetic picture of oneself as a person with a past, there is zero excuse for not offering the jury an alternative, which is that a small[-]framed minor should be defended against a larger angry assailant." Carriere, who does not cite any excerpt from M.D.'s testimony, generally argues there was no excuse for his trial counsel's failure either "to [] object to the guilt charge or ask for the insertion of an instruction on defense of another" after hearing the testimony.

The State argues that because there was no evidence of Carriere's state of mind when he shot Katthage, the evidence did not raise defense of a third person, and trial counsel cannot be ineffective for failing to request an instruction to which the defendant was not entitled. The State further asserts that the evidence Carriere cites is "exceptionally weak," given that the video shows M.D. was "nowhere near Katthage" when the shooting occurred and that Katthage was moving toward Carriere, not M.D.

To prevail under the *Strickland* analysis, Carriere must establish by a preponderance of the evidence that he was prejudiced by his trial counsel's failure to request an instruction on defense of a third person. *Lopez*, 343 S.W.3d at 142 (stating second prong of *Strickland* requires appellant to prove that but for counsel's deficient performance, there is reasonable probability the result of proceeding would

have been different). Carriere does not meet this threshold. Other than stating he was "harmed" and inquiring "what could be more harmful than to deny a jury and a client the benefit of an instruction that tells them it is ok to defend another," Carriere does not analyze or brief how he was harmed by the failure of his trial counsel to ask for an instruction on defense of a third person.

Under Section 9.33 of the Penal Code, Carriere would be justified in using deadly force against Katthage to defend M.D. only if Carriere also would be justified in using deadly force to defend himself against Katthage under the same circumstances. *See* TEX. PENAL CODE § 9.33(1) (stating person is justified in using force or deadly force against another to protect third person if "the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect"). The jury, which rejected Carriere's self-defense claim, would consider much of the same evidence had it been asked to determine whether Carriere was justified in shooting Katthage to defend M.D.

The record reflects that immediately prior to the shooting, Carriere and Katthage were each walking toward their respective apartments, Carriere on the concrete sidewalk leading to his apartment and Katthage on the grassy area leading to his. When Katthage reached his apartment door, he paused for a moment, turned around and started walking in the direction of Carriere who was standing several feet

33

away, it appears still on the sidewalk. M.D. was still in the parking lot and nowhere near Katthage when Carriere shot Katthage. In light of this evidence, it is unlikely the jury, who rejected Carriere's self-defense claim, would have found in Carriere's favor had an instruction on defense of a third person been included in the charge. *Cf. Wooten v. State*, 400 S.W.3d 601, 609 (Tex. Crim. App. 2013) ("It is highly unlikely that a jury that had already rejected the appellant's claim that he reasonably believed that deadly force was immediately necessary to defend himself would nevertheless find in his favor on the issue of sudden passion."); *cf. also Newkirk v. State*, 506 S.W.3d 188, 199 (Tex. App.—Texarkana 2016, no pet.) (holding appellant failed to establish prejudice as required by *Strickland* based on trial counsel's failure to request sudden passion instruction "[g]iven the jury's previous rejection of self defense and the evidence the jury had before it").

Thus, even if Carriere could establish that his trial counsel's representation fell below an objective standard of reasonableness, Carriere still would not prevail because he cannot establish he was prejudiced by his trial counsel's failure to request an instruction on defense of a third person. We conclude Carriere has not established by a preponderance of the evidence that but for counsel's deficient performance, there is a reasonable probability the result of the proceeding would have been different. *See Lopez*, 343 S.W.3d at 142 (citing *Strickland*, 466 U.S. at 689).

We overrule Carriere's third issue.

**Conclusion**

We affirm the trial court's judgment.


Veronica Rivas-Molloy
Justice


Panel consists of Chief Justice Adams and Justices Landau and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).